**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT SOUTH CAROLINA**
**Columbia Division**

| | |
|---|---|
| DISABILITY RIGHTS SOUTH CAROLINA, ABLE SOUTH CAROLINA, AMANDA McDOUGALD SCOTT, individually and on behalf of P.S., a minor; MICHELLE FINNEY, individually and on behalf of M.F., a minor; LYUDMYLA TSYKALOVA, individually and on behalf of M.A., a minor; EMILY POETZ, individually and on behalf of L.P., a minor; SAMANTHA BOEVERS, individually and behalf of P.B., a minor; TAMICA GRANT, individually and on behalf of E.G. a minor; CHRISTINE COPELAND individually and on behalf of L.C. a minor; HEATHER PRICE individually and on behalf of H.P. a minor; and CATHY LITTLETON individually and on behalf of Q.L. a minor, | Case No. _____ |
| *Plaintiffs*, | |
| v. | |
| HENRY McMASTER, in his official capacity as Governor of South Carolina; ALAN WILSON, in his official capacity as Attorney General of South Carolina; MOLLY SPEARMAN, in her official capacity as State Superintendent of Education; GREENVILLE COUNTY SCHOOL BOARD; HORRY COUNTY SCHOOL BOARD; LEXINGTON COUNTY SCHOOL BOARD ONE; OCONEE COUNTY SCHOOL BOARD; DORCHESTER COUNTY SCHOOL BOARD TWO; CHARLESON COUNTY SCHOOL BOARD; and PICKENS COUNTY SCHOOL BOARD, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Defendants*. | |

## PRELIMINARY STATEMENT

1.     As the school year begins and COVID-19 cases soar, local school districts face a dilemma: whether to comply with the state's Budget Proviso 1.108, which prohibits them from imposing mask mandates, or whether to meet their obligations under federal disability rights laws by protecting the health, safety, and dignity of their students with disabilities.

2.     On June 21, 2021, in passing its general budget, the South Carolina legislature enacted Budget Proviso 1.108, entitled "SDE: Mask Mandate Prohibition." The Proviso, which went into effect on June 25, 2021, provides that "[n]o school district, or any of its schools, may use any funds appropriated or authorized pursuant to this act to require that its students and/or employees wear a facemask at any of its education facilities."

3.     On July 6, 2021, Defendant Molly Spearman, State Superintendent of Education, directed each school board that, pursuant to Proviso 1.108, "school districts are *prohibited* from requiring students and employees to wear a facemask while in any of its educational facilities for the 2021-22 school year." Proviso 1.108 (emphasis added). This directive reversed the Department of Education's ("SCDOE") prior policy, and scorned the prevailing guidance from the United States Center for Disease Control ("CDC") and the South Carolina Department of Health and Environmental Control ("DHEC") recommending the use of face masks in indoor environments, including schools.

4.     Since Proviso 1.108 was enacted, the number of children nationwide who have contracted COVID-19 has increased over fourteen-fold (1,437 percent).

5.     Plaintiffs are students with disabilities, including certain underlying medical conditions, which increase their risk of contracting COVID-19 and/or increase their risk of

2

serious complications or death from a COVID-19 infection.  These conditions include asthma, congenital myopathy, Renpenning Syndrome, Autism, and weakened immune systems—many of which have been identified by the CDC as risk factors for severe COVID-19 infections.

6.     Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504" or "Rehabilitation Act") provide broad protections for individuals with disabilities. Both federal disability rights laws prohibit outright exclusion, denial of equal access, or unnecessary segregation for students with disabilities in public education. Both laws also prohibit methods of administration that defeat the fundamental goals of public schools, that is, to provide an education. Finally, both federal disability rights laws impose affirmative obligations on covered entities to proactively provide reasonable modifications or reasonable accommodations to ensure that individuals with disabilities have an equal opportunity to benefit from their public education.

7.     School districts with students who have disabilities, including underlying medical conditions, that make them more likely to contract and/or become severely ill from a COVID-19 infection have a legal obligation to ensure that those children can attend school with the knowledge that the school district has followed recommended protocols to ensure their safety. Currently, the CDC's and DHEC's recommended protocol—as well as those of the American Academy of Pediatrics and the American Medical Association—include universal masking. By prohibiting any school from imposing a mask mandate, Proviso 1.108 interferes with that school's ability to comply with its obligations under federal disability rights laws and illegally forces parents of children with underlying conditions to choose between their child's education and their child's health and safety, in violation of the ADA and Section 504. Further, such a prohibition needlessly and unconscionably exposes South Carolina school children and

their families to a heightened risk of infection, hospitalization, and death. It is against this law—

and its calamitous consequences—that Plaintiffs seek declaratory and injunctive relief.

## PARTIES

8.      Disability Rights South Carolina, Inc. ("DRSC") is a South Carolina nonprofit

corporation with principal offices in Columbia, South Carolina. DRSC is South Carolina's

Protection and Advocacy system ("P&A"), as that term is defined under the Developmental

Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 *et seq.*, the

Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42

U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act ("PAIR

Act"), 29 U.S.C. § 794e *et seq.* The DD Act authorizes P&A systems to pursue legal,

administrative, and other appropriate remedies or approaches to ensure the protection of, and

advocacy for, the rights of individuals with disabilities. *See* 42 U.S.C. § 15043(a)(2)(A)(i).  The

DD Act further specifically states that a P&A system may bring suit on behalf of individuals

with disabilities against a state or an agency or instrumentality of a state. DRSC seeks legal and

equitable relief on behalf of people with disabilities by way of its associational standing. The

interest DRSC seeks to protect through its participation in this action—to ensure that students

are not excluded from public school due to disability—is germane to DRSC's purpose. Courts

have recognized that P&A organizations represent the interests of individuals with disabilities

and have standing to challenge discriminatory practices because they share characteristics with

traditional membership advocacy organizations. Although individuals with disabilities certainly

have standing to sue in their own right, and are in fact participating directly in this action,

neither the claims asserted nor the relief requested requires individual plaintiffs to do so where

their interests are represented by DRSC.

9.     ABLE SOUTH CAROLINA ("Able SC") is a Center for Independent Living ("CIL") serving people with disabilities residing throughout South Carolina. Authorized by the Rehabilitation Act of 1973, as amended, CILs provide independent living services for people with disabilities based on the belief that all people can live with dignity, make their own choices, and participate fully in society. Able SC is a consumer-controlled, community-based, cross-disability nonprofit providing an array of independent living services to empower people with disabilities to live active, self-determined lives including advocacy, services, and support. Able SC has associational standing to represent the interests of the people it serves who are adversely affected by Budget Proviso 1.108.

10.    AMANDA McDOUGALD SCOTT is an individual, *sui juris*, who resides in Greenville County, South Carolina. Ms. McDougald Scott is the parent of P.S., a disabled child. P.S. is diagnosed with asthma.

11.    MICHELLE FINNEY is an individual, *sui juris*, who resides in Dorchester County, South Carolina. Ms. Finney is the parent of M.F., a disabled child. M.F. is diagnosed with Renpenning Syndrome.

12.     LYUDMYLA TSYKALOVA is an individual, *sui juris*, who resides in Pickens County, South Carolina. Ms. Tsykalova is the parent of M.A., a disabled child. M.A. is diagnosed with asthma.

13.    EMILY POETZ is an individual, *sui juris*, who resides in Pickens County, South Carolina. Ms. Poetz is the parent of L.P., a disabled child. L.P. has congenital myopathy.

14.    SAMANTHA BOEVERS is an individual, *sui juris*, who resides in Charleston County, South Carolina. Ms. Boevers is the parent of P.B., a disabled child. P.B. is on the Autism spectrum and has been identified as a student with a disability.

15.     TAMICA GRANT is an individual, *sui juris*, who resides in Greenville County, South Carolina. Ms. Grant is the parent of E.G., a disabled child.  E.G. is on the Autism spectrum, has ADHD, and has been identified as a student with a disability.

16.     CHRISTINE COPELAND is an individual, *sui juris*, who resides in Horry County, South Carolina. Ms. Copeland is the parent of L.C., a disabled child.  L.C. is on the Autism spectrum, has severe anxiety, and has been identified as a student with a disability.

17.     HEATHER PRICE is an individual, *sui juris*, who resides in Lexington County, South Carolina. Ms. Price is the parent of H.P., a disabled child. H.P. is on the Autism spectrum and has ADHD and has been identified as a student with a disability.

18.     CATHY LITTLETON is an individual, *sui juris*, who resides in Oconee County, South Carolina. Ms. Littleton is the parent of Q.L., a disabled child.  Q.L. is on the Autism spectrum, has global developmental delays, is nonverbal, has a history of respiratory system infection, and has been identified as a student with a disability.

19.     Plaintiffs McDOUGALD SCOTT, FINNEY, TSYKALOVA, POETZ, GRANT, COPELAND, PRICE, and LITTLETON are referred to as the Individual Plaintiffs.

20.     The Individual Plaintiffs are students who are "qualified individuals with disabilities" under the ADA and who are protected from discrimination by the ADA.

    a.   The Individual Plaintiffs have a physical or mental impairment that substantially limits one or more major life activities, or a record of such an impairment, 42 U.S.C. § 12102(2)(A), (B).

    b.   The Individual Plaintiffs meet the "essential eligibility requirements" for participation in the programs or activities provided by the public entity (e.g.,

they are the right age to be eligible for public education in the state), 42 U.S.C. § 12131(2).

21.     The Defendant HENRY McMASTER is Governor of the State of South Carolina. Defendant McMaster signed the budget legislation containing Proviso 1.108 and is responsible under South Carolina law for ensuring "the laws be faithfully executed." S.C. CONST. art. IV, § 15. Prior to the passage of Proviso 1.108, Defendant McMaster enacted an Executive Order containing a similar prohibition on mask mandates; on information and belief, he encouraged the Legislature to enact Proviso 1.108, and he has publicly advocated for Proviso 1.108 to remain in effect and to be vigorously enforced. Defendant McMaster is sued in his official capacity as the Governor of the State of South Carolina.  The State of South Carolina and the Office of the Governor are public entities within the meaning of the ADA, 28 C.F.R. § 35.104, and recipients of federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a).

22.     The Defendant ALAN WILSON is Attorney General of the State of South Carolina and is the head of the Office of Attorney General. Defendant Wilson is responsible under South Carolina law for enforcement of South Carolina's laws, including Proviso 1.108. In his official capacity, Defendant Wilson recently brought legal action against the City of Columbia over the City's noncompliance with Proviso 1.108. Defendant Wilson is sued in his official capacity as the Attorney General of South Carolina. The State of South Carolina and the Office of the Attorney General are public entities within the meaning of the ADA, 28 C.F.R. § 35.104, and recipients of federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a).

23.     The Defendant MOLLY SPEARMAN is Superintendent of the South Carolina

Department of Education (SCDOE) and is responsible for the acts and omissions of the SCDOE. Defendant Spearman is sued in her official capacity as the Superintendent of the South Carolina Department of Education. The State of South Carolina and the South Carolina Department of Education are public entities within the meaning of the ADA, 28 C.F.R. § 35.104, and recipients of federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a).

24.     DEFENDANTS McMASTER, WILSON, and SPEARMAN are collectively referred to as the DEFENDANT STATE OFFICIALS.

25.     The Defendant, GREENVILLE COUNTY SCHOOL BOARD ("Board" or "District"), an indispensable but not adverse party, is a corporate and governmental agency duly empowered by the constitution and statutes of the state of South Carolina to administer, manage, and operate the Greenville County Public Schools. The Board receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

26.     The Defendant, HORRY COUNTY SCHOOL BOARD ("Board" or "District"), an indispensable but not adverse party, is a corporate and governmental agency duly empowered by the constitution and statutes of the state of South Carolina to administer, manage, and operate the Horry County Public Schools. The Board receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

27.     The Defendant, LEXINGTON COUNTY SCHOOL BOARD for District 1 ("Board" or "District"), an indispensable but not adverse party, is a corporate and governmental agency duly empowered by the constitution and statutes of the state of South Carolina to

administer, manage, and operate the Lexington County Public Schools. The Board receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

28.     The Defendant, OCONEE COUNTY SCHOOL BOARD ("Board" or "District"), an indispensable but not adverse party, is a corporate and governmental agency duly empowered by the constitution and statutes of the state of South Carolina to administer, manage, and operate the Oconee County Public Schools. The Board receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

29.     The Defendant, PICKENS COUNTY SCHOOL BOARD ("Board" or "District"), an indispensable but not adverse party, is a corporate and governmental agency duly empowered by the constitution and statutes of the state of South Carolina to administer, manage, and operate the Pickens County Public Schools. The Board receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

30.     The Defendant, CHARLESTON COUNTY SCHOOL BOARD ("Board" or "District"), an indispensable but not adverse party, is a corporate and governmental agency duly empowered by the constitution and statutes of the state of South Carolina to administer, manage, and operate the Charleston County Public Schools. The Board receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

31.     The Defendant, DORCHESTER COUNTY SCHOOL BOARD for District 2 ("Board" or "District"), an indispensable but not adverse party, is a corporate and governmental

agency duly empowered by the constitution and statutes of the state of South Carolina to administer, manage, and operate the Dorchester County Public Schools. The Board receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

32.     The School Board Defendants are necessary and indispensable parties, and in their absence, the children who attend school in their districts may not be able to obtain complete relief. Absent inclusion in this suit, the School Board Defendants may be left subject to a substantial risk of incurring inconsistent obligations because of their interests.

## JURISDICTION AND VENUE

33.     Jurisdiction for this action vests pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) based upon claims brought under the Americans with Disabilities Act of 1990; 29 U.S.C. § 794, for claims brought under Section 504 of the Rehabilitation Act of 1973.

34.     Venue for this action lies pursuant to 28 U.S.C. § 1391(b) in that more than one Defendant and more than one Plaintiff reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred and continue to occur in this district.

35.     Venue is proper in the Columbia division under Local Rule 3.01 because the defendants reside in this division, a substantial portion of the events or omissions giving rise to the claim occurred in this division, and the organizational Plaintiffs do business related to the events or omissions alleged in this division.

## FACTS

### THE CURRENT STATE OF THE COVID-19 PANDEMIC

36.     The history of the COVID-19 pandemic is well-known, and an extensive body of evidence shows that COVID-19 is a highly communicable respiratory virus that spreads

through close contact.

37.    Since the inception of the pandemic, more than 650,000 positive cases of COVID-19 in South Carolina have been recorded, more than 25,000 South Carolinians have been hospitalized, and more than 10,000 South Carolinians have died.[1] Cases peaked in South Carolina in January 2021 when over 40,000 new cases were reported in single week.  The number of deaths, hospitalizations, and infections began declining in early 2021 once vaccines became available.  By June 2021, the number of new COVID-19 cases reported per week in South Carolina had decreased to fewer than 1,100.

34.    The medical landscape drastically changed with the arrival of the highly contagious and virulent Delta variant of COVID-19.  The number of newly reported cases, hospitalizations, and deaths due to COVID-19 have all increased sharply.  Last week, over 23,000 new cases were reported in South Carolina.

35.    The newest data on the Delta variant is particularly troubling for students and school districts. For example, data shows children are infected with the Delta variant at much higher rates than was true with previous virus strains, especially those who are unvaccinated (including those 5 to 11 years old who are not yet eligible to receive a vaccine).

36.    According to the American Academy of Pediatrics, "the Delta variant has created a new and pressing risk to children and adolescents across this country." Pediatric cases of COVID-19 have been "skyrocketing." For the week ending July 29, 2021, "nearly 72,000 new coronavirus cases were reported in kids—almost a fifth of all *total* known infections in the U.S., and a rough doubling of the previous week's stats." By the week of August 12, the number of new coronavirus cases in children jumped to over 121,000. As the American Academy of Pediatrics explained: "The

---

[1] https://scdhec.gov/covid19/south-carolina-county-level-data-covid-19

higher proportion of cases in this population means this age group could be contributing in driving continued spread of COVID-19. Sadly, over 350 children have died of COVID-19 since the start of [the] pandemic and millions of children have been negatively impacted by missed schooling, social isolation, and in too many cases, the death of parents and other caregivers."

37.     The view close to home is particularly disturbing. Recent DHEC numbers show that South Carolina has the third highest proportion of pediatric COVID-19 cases in the United States, with children accounting for over 19% of all South Carolina COVID-19 cases.

COVID-19 POSES EXTREME RISKS TO STUDENTS WITH DISABILITIES

38.     School-aged children with certain disabilities, including a range of underlying medical conditions, are at increased risk of contracting or developing a severe illness from COVID-19 as compared to other children. According to the CDC, "[c]urrent evidence suggests that children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19." And as with adults who face increased risks, "children with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or immunosuppression can also be at increased risk for severe illness from COVID-19."

39.     These are not the only children at risk of grave harm. Individuals with intellectual disabilities are also at increased risk of contracting COVID-19 and of dying from COVID-19 infection.  A recent study published in the New England Journal of Medicine—working with a data set of 64,414,495 patients across more than 500 U.S. healthcare systems—concluded that "intellectual disability was the strongest independent risk factor for presenting with a Covid-19 diagnosis and the strongest independent risk factor other than age for Covid-19 mortality." The study found individuals with intellectual disabilities were more likely to contract COVID-19; if

diagnosed with COVID-19, more likely to be admitted to the hospital; and more likely to die following admission.

40.    The risks reflect the risks associated with intellectual disability itself, as well as comorbidities that in the study were overrepresented among those with intellectual disabilities. Notably, the odds of mortality among those with intellectual disabilities in the study were "significantly higher than other conditions such as congestive heart failure, kidney disease, and lung disease."

41.    South Carolina school districts regularly serve students with these disabilities— moderate to severe asthma, chronic lung and heart conditions, cerebral palsy, Down syndrome, obesity, and weakened immune systems are common. For the 2020-2021 school year, 101,365 of 761,290 students enrolled in South Carolina public schools were identified as "special education" students, of whom 99,301 were placed inside regular classes for at least part of the day. As of the 2020-2021 survey, 5,858 students were identified has having an intellectual disability, 9,859 students were identified as having an autism spectrum disorder, 184 have traumatic brain injuries, 40,962 have a specific learning disability, and 16,087 are identified as "other health impaired."

42.    The COVID-19 pandemic has dramatically affected students with disabilities, beginning with the closure of the public school system in the spring of 2020. Many students lost critical instruction and services, an issue that persisted into the 2020-21 school year.

43.    The American Academy of Pediatrics has advised that "[r]emote-learning highlighted inequities in education, was detrimental to the educational attainment of students of all ages and exacerbated the mental health crisis among children and adolescents." Likewise, the

13

CDC concluded that "[s]tudents benefit from in-person learning, and safely returning to in-person instruction in the fall 2021 is a priority."

44.    The detrimental impact on education from the COVID-19 pandemic has been especially alarming for students with disabilities. All students with disabilities who are eligible for special education, are aged three through twenty-one, and who reside in the state have the right to Free and Appropriate Public Education ("FAPE") consistent with the requirements of S.C. Code Regs. § 43-243(III)(C). Federal law further mandates that children with disabilities be taught in the least restrictive environment and, as much as possible, be maintained in the school and the classroom they would attend if they were not disabled.

45.    As detailed by the U.S. Department of Education, COVID-19 has "significantly disrupted the education and related aids and services needed to support their academic progress and prevent regression." Students with disabilities have not only lost critical in-class instruction, but they have also lost services such as speech and occupational therapy as well as behavioral support and counseling. Many parents have reported regression. And there is evidence that the disruption in services and instruction "may be exacerbating longstanding disability-based disparities in academic achievement."

46.    After signing the bill in April 2021 requiring all school districts in the state to offer full time in-person instruction, Governor McMaster said, "the best place for the children to be is in the classroom." This was echoed by Superintendent Spearman, who said "[e]very family must be given the option of sending their child to school five days a week face to face and the science shows that this can be done safely in every community." Students with disabilities must have the same options as other students.

47.    The CDC unambiguously recommends "universal indoor masking by all

students (age 2 and older), staff, teachers, and visitors to K-12 schools, regardless of vaccination status." In announcing this recommendation, the CDC noted that "[w]hen teachers, staff, and students consistently and correctly wear a mask, they protect others as well as themselves" and that "protection against exposure remains essential in school settings." The American Academy of Pediatrics and the American Medical Association similarly recommend that schools adhere to universal masking policies.

48.     The U.S. Department of Education's roadmap for returning students to school safely—with its first priority being the health and safety of students, staff and educators—fully adopted the CDC recommendation.

49.     Faced with rising COVID-19 cases and the threat of the Delta variant, the South Carolina DHEC has similarly recommended "public indoor masking for everyone, regardless of vaccination status. This includes masking for teachers, students, parents and visitors in K-12 schools." Although noting that state law "prohibits the implementation of mask mandates in schools," SCDHEC Director of Public Health Brannon Traxler stated "the very concerning trends we are seeing nationally and here in South Carolina regarding increasing case rates … makes it necessary to return to recommending universal masking in public indoor settings."

50.     Research supports the effectiveness of universal masking in schools. The ABC Science Collaborative, led by top physicians on the staff of Duke University, studied data from 100 school districts in North Carolina, and found that "[w]hen masking is in place, COVID-19 transmission in schools is low."[2] This finding strengthens CDC's claim that "when teachers, staff, and students consistently and correctly wear a mask, they protect others as well as themselves."[3]

---

[2] https://abcsciencecollaborative.org/author/elizabeth-mccamicduke-edu/

[3] https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html

## THE RECENT RESPONSE OF SOUTH CAROLINA OFFICIALS TO COVID-19

51.     Despite increased numbers of cases and deaths being reported in the state of South Carolina, and despite guidance from the U.S. Department of Education, the CDC, and public health experts, Governor McMaster and Attorney General Wilson have remained steadfast in their position that school districts should not impose mask mandates.

52.     On March 13, 2020, Defendant McMaster declared a public health emergency. Governor McMaster repeatedly extended the order through 30 separate declarations until finally lifting the emergency order on June 7, 2021. At the time Governor McMaster lifted the state of emergency, South Carolina was reporting only approximately 100 new COVID-19 cases per day. Seventeen days later, Governor McMaster signed the budget bill containing Proviso 1.108.

53.     In the months since Proviso 1.108 was passed, the number of children contracting COVID-19 has increased over fourteen-fold (1,437 percent). With the emergence of the Delta variant, COVID-19 infection rates, daily cases, and COVID-related hospitalizations have ballooned in South Carolina. As compared to when Proviso 1.108 was passed, the number of reported new cases twenty times higher; hospital intensive care units are full; and COVID-related deaths have again begun to climb. Specifically, in recent days, South Carolina has reported between 2,000 and 5,000 new cases per day. And in the last three weeks, South Carolina has reported over 10,000 new cases among South Carolina children. In South Carolina, across the few days schools have reopened, there have been almost 300 COVID-19 cases reported in schools.  Pediatric intensive care units also report that they are full or near capacity.

54.     Notwithstanding the reemergence of COVID-19, Governor McMaster has doubled down on the prohibition on mask mandate, recently tweeting "mandating masks is not the answer. Personal responsibility is."  On August 9, he reiterated "for the government to mask

children who have no choice . . . is the wrong thing to do. And we're not going to do it." And on August 20, he tweeted "to suggest that bureaucrats in Washington should tell parents that they must force their children to wear a mask in school against their wishes is a drastic error. I think it's wrong."

55.     Attorney General Wilson has taken a similar position. On August 10, Attorney General Wilson wrote to the City of Columbia that a City Ordinance requiring all faculty, staff, visitors, and students in school buildings wear facemasks conflicted with Proviso 1.108 and should be rescinded or amended. Defendant Wilson has since filed suit in the South Carolina Supreme Court seeking to enjoin Columbia's City Ordinance.

56.     In spite of national and local guidance urging precaution, Proviso 1.108 prohibits local school districts from even considering whether to implement the most basic and effective COVID-19 prevention strategy in school settings. The State Department of Education is continuing to abide by the July 6 directive that "school districts are prohibited from requiring students and employees to wear a facemask while in any of its educational facilities for the 2021-22 school year."

<u>COVID-19 AS SCHOOLS REOPEN</u>

57.     Enforcement of Proviso 1.108 by State officials places all children and staff at risk. Children under twelve are ineligible to be vaccinated and many live with disabilities that place them at a higher risk for severe illnesses or death due to COVID-19. While children twelve and older can be vaccinated, many are not, and those who are vaccinated may still spread COVID-19, including to younger children and others who either cannot be or are not vaccinated.

58.     The gravity of the situation is perhaps best illustrated by the state of affairs in Pickens County.  School opened earlier in Pickens than in most of the state, placing it in the

unenviable position of testing maskless in-person learning.

59.    Nine days after it reopened for the 2021-22 school year, the Pickens County School District announced that it was reverting to all-virtual classes after 142 students and 26 staff tested positive for COVID-19.  As a result of those positive cases, 634 students (5 percent of the total student population) were forced into quarantine because of contact with infected individuals.

60.    On August 17, 2021, in the wake of the Pickens County infection statistics, Defendant Superintendent Spearman called upon the State Legislature to lift Proviso 1.108.

61.    On August 20, 2021, the South Carolina DHEC Board called upon the Governor to recall the South Carolina legislature to repeal Proviso 1.108.[4]

62.    Disturbingly, COVID-19 infections in Dorchester County School District 2 have already eclipsed the numbers from Pickens County. After one week of school (August 16-20), the Dorchester County School District 2 is reporting 324 infected students and 42 infected staff. As of August 23, 2021, 771 students are in quarantined.[5] Three Dorchester County School District 2 staff members have already died from the virus this month.

63.    Under the ADA and Rehabilitation Act, public-school districts must provide all children with disabilities an equal opportunity to benefit from a public education, which includes receiving their education in an integrated environment, without needless segregation.  In short, children with disabilities are entitled to learn and interact with all other children, to receive the same education as all other children, and to be returned home as safe and healthy as possible.

---

[4] Jeffrey Collins, *SC health board joins groups asking to end school mask ban*, Associated Press (Aug. 20, 2021), https://apnews.com/article/business-health-coronavirus-pandemic-a22ea100ce5b97a16680f55350a8c99a (last visited Aug. 21, 2021).

[5] https://www.ddtwo.org/covid (accessed Aug. 23, 2021).

64.     The COVID-19 pandemic has not absolved South Carolina schools from the strictures of the ADA or Rehabilitation Act.  Likewise, South Carolina officials do not have the authority to order school districts to violate their obligations under federal law.

65.     By forbidding local school districts and public health authorities from having the freedom to respond to the ongoing COVID-19 crisis and to require masks for their students and staff, Proviso 1.108 has made it impossible for school districts to provide a safe learning environment to students with disabilities at risk of severe illness from COVID-19. Students with disabilities who are unable to safely return to brick-and-mortar schools because of continued health concerns are being excluded from the public school system in violation of the ADA and Rehabilitation Act.

66.     There are no viable alternatives for students with disabilities who cannot safely return to school in-person due to Proviso 1.108.  The Defendant State Officials' actions have put parents in the impossible situation of having to choose between the health and life of their child and educating their child.  Thus, the Defendants' actions will have the perverse effect of either placing children with disabilities in imminent danger or unlawfully forcing those children out of the public school system.

67.     In so ordering their school districts, the Defendant State Officials violated Title II of the ADA, Section 504 of the Rehabilitation Act, and the Supremacy Clause of the United States Constitution.  By refusing to allow basic and effective protocols to protect students with disabilities from COVID-19 infections, South Carolina state officials have effectively excluded these students with disabilities from participation in the public education system, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130, have subjected these students to discrimination on the basis of their disabilities, in violation of 28 C.F.R. § 35.130(b)(3), and have employed

methods of administration that have the effect of defeating or substantially impairing

accomplishment of the objectives of the public entity's program with respect to individuals with

disabilities, in violation of 28 C.F.R. § 35.130(b)(3).  Furthermore, complying with Proviso

1.108 precludes school districts from making reasonable modifications for their students with

disabilities, as required by 28 C.F.R. § 35.130(b)(7).

<u>HARM TO THE NAMED PLAINTIFFS</u>

68.    Plaintiffs and other children with disabilities are at heightened risk for severe

illness or death from COVID-19 and cannot attend public school without reasonable

accommodation for their unique health situations. By this action, Plaintiffs ask this Court to

enjoin Proviso 1.108 so that such accommodations can be made and needless suffering can be

averted.

69.    The Defendant State Officials have directly harmed each of the named Plaintiffs

who now have to risk their health and safety in order to obtain desperately needed in-person

instruction and services.

70.    <u>Amanda McDougald Scott and P.S. in Greenville County School District</u>

a.  P.S. is 5 years old and has asthma.

b.  Because of his age, P.S. cannot be vaccinated.

c.  P.S. is assigned to Blythe Elementary School, which is within Defendant

Greenville County School District.

d.  Because of his asthma, M.A. is at a heightened risk of serious illness due to

COVID-19.

e.  McDougald Scott was advised online that virtual learning at Blythe Elementary

was full, or closed, for the 2021-22 school year.

    f.  McDougald Scott pulled P.S. out of public school and placed him at the Furman Child Development Center because of Blythe's inability to follow CDC and DHEC guidance regarding masking indoors.

    g.  The Furman program requires McDougald Scott to travel 30 minutes for pick-up and drop-off and required her family to incur a significant and unplanned financial burden.

    h.  P.S. would attend school at Blythe Elementary School if the school were allowed to require masking for students and staff around P.S.

71.  <u>Michelle Finney and M.F. in Dorchester County School District 2</u>

    a.  M.F. is 16 years old and has a rare genetic disease called Renpenning Syndrome.

    b.  M.F.'s condition causes developmental delay, intellectual disability, and distinctive physical features.

    c.  M.F. attends Summerville High School in Defendant Dorchester County School District 2 and has an IEP.

    d.  Because of his condition, M.F. is at a heightened risk of serious illness due to COVID-19.

    e.  Dorchester County School District 2 has experienced dramatic COVID-19 transmission during the first week of in-person classes.

    f.  Summerville High School cannot require masks around M.F. because of Budget Proviso 1.108.

    g.  Because of the high rates of transmission and Summerville High School's inability to follow CDC and DHEC guidance regarding masking, Ms. Finney is temporarily keeping M.F. home from school.

h. If Budget Proviso 1.108 were removed and M.F.'s school began requiring masks for students and staff that were in contact with him, M.F. would be able to safely receive the services and education he needs and deserves.

72. <u>Lyudmyla Tsykalova and M.A. in Pickens County School District</u>

a. M.A. is 5 years old and has asthma.

b. Because of her age, M.A. cannot be vaccinated.

c. M.A. attends Clemson Elementary School, which is within Defendant Pickens County School District.

d. Because of her asthma, M.A. is at a heightened risk of serious illness due to COVID-19.

e. The only accommodation offered to L.P. for the 2021-22 school year is to participate in virtual learning while her peers attend school in person.

f. Mask mandates for M.A.'s classmates and teachers would reduce her risk considerably and allow her to attend classes in person.

73. <u>Emily Poetz and L.P. in Pickens County School District</u>

a. L.P. is 6 years old and has congenital myopathy.

b. Because of his age, L.P. cannot be vaccinated.

c. L.P. attends Clemson Elementary School, which is within Defendant Pickens County School District.

d. L.P. has an IEP, receives speech and occupational therapy, and qualifies for services under the Katie Beckett Program.

e. Because of L.P.'s disability, he has weak chest muscles and is particularly vulnerable to serious upper respiratory illnesses—including COVID-19.

    f.   The only accommodation offered to L.P. for the 2021-22 school year is to participate in virtual learning while his peers attend school in person.

    g.   Mask mandates for L.P.'s classmates and teachers would reduce his risk considerably and allow him to attend classes in person.

74.   <u>Samantha Boevers and P.B. in Charleston County School District</u>

    a.   P.B. is an elementary school student with Autistic Spectrum Disorder.

    b.   P.B. attends Springfield Elementary School, which is within Defendant Charleston County School District.

    c.   P.B. has an IEP.

    d.   Because of P.B.'s disability, he has serious difficulty adhering to COVID-19 mitigation strategies, particularly practicing social distancing and hand washing.

    e.   P.B. has been previously hospitalized for basic illnesses—such as the flu— because of his inability to communicate his symptoms and comply with treatment regimes.

    f.   P.B.'s pediatrician has advised that he should only return to school in a fully masked environment.

75.   <u>Tamica Grant and E.G. in Greenville County School District</u>

    a.   E.G. is 9 years old and is on the Autism spectrum and has ADHD.

    b.   E.G. attends a Greenville County public school and has been identified by GCPS as a student in need of exceptional student education services and has an IEP.

    c.   E.G.'s disability causes him to struggle with social distancing. He has lack of spatial awareness and seeks constant physical touch. This makes it impossible for him to stay six feet away from other children and staff.

d.  Defendants' actions have forced E.G.'s mother to decide whether to return E.G. to public school and risk his life or leave the public school system.

76.  <u>Christine Copeland and L.C. in Horry County School District</u>

a.  L.C. is 11 years old and is on the Autism spectrum and has anxiety.

b.  L.C. attends a Horry County public school and has been identified by HCPS as a student in need of exceptional student education services and has an IEP.  As part of her IEP, she has support from a paraprofessional teacher for five and a half hours per day when she attends school.

c.  L.C.'s disability causes her to become nervous or scared by things she does not expect; this causes her to be in a fight or flight mode.

77.  <u>Cathy Littleton and Q.L. in Oconee County School District</u>

a.  Q.L. is 5 years old and is on the Autism spectrum, Global Developmental Delays, is nonverbal, and has a history of RSV infection.

b.  Q.L. is too young to be vaccinated.

c.  Q.L. attends an Oconee County public school and has been identified by OCPS as a student in need of exceptional student education services and has an IEP.

d.  Q.L.'s health conditions make it more likely he would be severely impacted if he contracts COVID-19. His physician has recommended that he not attend school due to his disability and rates of COVID-19 at this time.

e.  Q.L.'s parents believe that it is too dangerous to return to brick-and mortar school without such precautions as following the recommended CDC guidelines such as mandatory masking and regular testing in schools.

f.  Defendants' actions have forced Q.L.'s parents to decide whether to return Q.L.

to public school and risk his/her life or leave the public school system.

78. <u>Heather Price and H. P. in Lexington County School District 1</u>

a. H.P. is 15 years old and is on the Autism spectrum and has ADHD.

b. H.P. attends a Lexington County public school and has been identified by LCPS as a student in need of exceptional student education services and has a 504 plan.

c. H.P.'s disability includes mimicking peer behavior. Due to his disability, he has to be reminded about social distancing and washing his hands.

d. Although H.P. is fully vaccinated, his father is disabled and has Charcot-Marie-Tooth disease, which makes him high risk for COVID-19. In addition, H.P. has a four-year-old sibling who is too young to be vaccinated.

e. His parents believe that it is too dangerous to return to brick-and-mortar school without such precautions as following the recommended CDC guidelines such as mandatory masking and regular testing in schools.

f. Defendants' actions have forced H.P.'s parents to decide whether to return H.P. to public school and risk his life and the lives of his family members or leave the public school system.

## CLAIMS FOR RELIEF

## <u>COUNT ONE</u>

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

79. Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

80. The Defendants are public entities and are therefore subject to Title II of the ADA.

81.     The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1) & (2).

82.     Enactment of the ADA reflected deeply held American ideals that treasure the contributions that individuals can make when free from arbitrary, unjust, or outmoded societal attitudes and practices that prevent the realization of their full potential.

83.     The ADA embodies a public policy committed to the removal of a broad range of impediments to the integration of people with disabilities into society and strengthening the federal government's role in enforcing the standards established by Congress.

84.     The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

85.     As a result of the Defendant State Official's implementation of Proviso 1.108 to deny these children the protection that they need to attend school in a safe environment, the Defendants have violated the regulations and provisions of the ADA as follows:

    a.    The Defendants are excluding Plaintiffs from the participation in public education (42 U.S.C. § 12132; 28 C.F.R. § 35.130);

    b.    The Defendants are failing or causing other Defendants to fail to make a reasonable modification under circumstances where it is required (28 C.F.R. § 35.130(b)(7);

c.    The Defendants are failing or causing other Defendants to fail to make services, programs, and activities "readily accessible" to disabled individuals (28 C.F.R. § 35.150);

d.    The Defendants are administering a policy that (1) has the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability and that has the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities, or (2) perpetuates the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State. 28 C.F.R. § 35.130 (b)(3)(i) & (iii); and

e.    The Defendants are failing to permit a public entity to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d). Relegating students into a separate classroom or remote learning "for their safety" would violate of this integration mandate.

86.    The Defendant State Officials do not have the authority to circumvent the ADA and protections for students with disabilities through a state budget proviso.

87.    Excluding children from the public-school classroom because of a disability or not placing a student in the least restrictive environment is exactly the type of discrimination and segregation the ADA and its amendments aim to prevent and specifically prohibit.

88.    As public entities and instrumentalities of the state, the Defendant School Districts are prohibited from providing "a qualified individual with a disability with an aid,

benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. 35.130(b)(1)(iii).

## COUNT TWO

## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

89.     Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

90.     Plaintiffs are children with disabilities that substantially limit one or more major life activities and therefore are considered persons with a disability under Section 504 of the Rehabilitation Act, as amended. *See* 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1).

91.     The Plaintiffs otherwise qualify under Section 504 of the Rehabilitation Act because they meet the essential eligibility requirements for public education and for the Defendants' services at all times material hereto.

92.     The Defendants are recipients of federal financial assistance.

93.     Defendants are obligated to provide a free appropriate public education to each qualified individual with a disability who is in the recipient's jurisdiction. 34 C.F.R. § 104.33.

94.     Defendants' policies, practices, and procedures—particularly the actions and omissions described herein—violate the students' rights under Section 504 of the Rehabilitation Act by discriminating on the basis of disability.

95.     As a result of the implementation of Proviso 1.108, Defendants have violated the regulations and provisions of Section 504 of the Rehabilitation Act and/or caused Defendant School Districts to violate the regulations and provisions as follows:

a.    The Defendants are excluding, and/or causing Plaintiffs' School Districts to exclude, Plaintiffs from the participation in public education in violation of 29 U.S.C. § 794(a),  42 U.S.C. § 12132; and 34 C.F.R. § 104..4(a) and (b)(1)(i));

b.    The Defendants are administering a policy that has the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability with the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 34 C.F.R. § 104.4 (b)(4).

c.    The Defendants are failing to permit a public entity to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 34 C.F.R. § 104.4 (b)(2).

96.    Defendants lack authority to enforce or implement laws that violate Section 504. Even in a pandemic, Defendants are required to adhere to the robust protections contained in the Rehabilitation Act.

97.    Proviso 1.108, which functionally excludes many children with disabilities from the public classroom, cannot be enforced.

## COUNT THREE

**FEDERAL PREEMPTION UNDER THE AMERICAN RESCUE PLAN ACT OF 2021**

98.    Plaintiffs repeat and reallege the allegations in previous paragraphs of this Complaint as if fully alleged herein.

99.    Federal law is the "supreme Law of the Land," and must prevail over any contrary provision of state law. U.S. CONST. art. VI, cl. 2; *Felder v. Casey*, 487 U.S. 131, 138 (1988) ("[A]ny state law, however clearly within a State's acknowledged power, which

interferes with or is contrary to federal law, must yield."). Under the doctrine of preemption, a state law is preempted by federal law when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204 (1983).

100.    The United States Congress enacted the American Rescue Plan Act of 2021 ("ARPA") as a comprehensive legislative response to the COVID-19 pandemic. According to House Budget Committee Chairman John Yarmuth, the Act was enacted to "provide economic relief to nearly every American family and hard-working individual, get vaccines into the arms of millions of Americans, *and get our schools open safely*."[6]

101.    To that end, ARPA allocated huge sums of money to state school districts. South Carolina school districts were allocated over $1.9 billion in Elementary and Secondary School Emergency Relief (ESSER) to prepare for a safe return to in-person schooling.[7] Section 2001(e)(2)(Q) of ARPA explicitly gives local school districts the authority to use these ARPA ESSER funds for "developing strategies and implementing public health protocols including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff." *Id.* § 2001(e)(2)(Q). As discussed above, the CDC's guidance specifically recommends universal indoor masking in all K-12 schools.

102.    The interim guidance for ESSER adopted by the U.S. Department of Education

---

[6] https://budget.house.gov/news/press-releases/house-sends-yarmuth-led-american-rescue-plan-act-president-biden-s-desk (accessed Aug. 23, 2021).

[7] https://oese.ed.gov/offices/american-rescue-plan/american-rescue-plan-elementary-and-secondary-school-emergency-relief/ (accessed Aug. 23, 2021).

("USDOE") sheds further light on the intent and purpose of ARPA. In directing school districts how their ARPA funds must be used, USDOE advised that districts must explain: "the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC…", specifically including "universal and correct wearing of masks." *See* Am. Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195, 21200 (April 22, 2021).

103.    Although USDOE did not mandate that local school districts adopt CDC guidance, the department's interim guidance required each district "describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance," which include both "[u]niversal and correct wearing of masks[.]" *Id.* Of particular relevance for Plaintiffs here, the interim guidance further directed local school districts to pay special attention to "those students disproportionately impacted by the COVID-19 pandemic, including . . . children with disabilities." *Id.*

104.    As USDOE noted in its August 18, 2021 letter to Defendants McMaster and Spearman, South Carolina Budget Proviso 1.108 is squarely at odds with the purpose of ARPA and stands as an obstacle to the accomplishment and execution of ARPA's full purposes and objectives.[8] Rather than affording discretion to local school boards to develop and implement safety protocols as envisioned by ARPA, Budget Proviso 1.108 *prohibits* local school districts, including Defendant School Boards, from implementing precisely the type of safe return-to-school policies encouraged by ARPA. As explained by Secretary Cardona, Proviso 1.108 "restrict[s] the development of local health and safety policies and is at odds with the school

---

[8] https://oese.ed.gov/files/2021/08/21-006974-Letter-from-Secretary-Cardona-South-Carolina-final-signed.pdf (accessed Aug. 23, 2021).

district planning process embodied in the U.S. Department of Education's (Department's) interim final requirements."

105.    In the face of its direct conflict with federal law, Proviso 1.108 must fall. It is preempted by the American Rescue Plan Act.

## PRAYER FOR RELIEF

WHEREFORE, the PLAINTIFFS respectfully request this Court to:

1. Declare the actions of the Defendants violate the ADA;

2. Declare that Defendants have subjected the Plaintiffs to discrimination in violation of Section 504 of the Rehabilitation Act;

3. Declare that Budget Proviso 1.108, and Defendants' implementation thereof, is preempted by the American Rescue Plan Act;

4. Issue a temporary restraining order enjoining the Defendants from violating the ADA, Section 504 of the Rehabilitation Act, and the ARPA by prohibiting school districts from requiring masks for their students and staff;

5. Preliminarily and permanently enjoin the Defendants from violating the ADA, Section 504 of the Rehabilitation Act, and the ARPA by prohibiting school districts from requiring masks for their student and staff;

6. Award Plaintiffs' attorneys' fees, costs and expenses incurred in this matter; and

7. Provide any such further relief as the Court deems just and equitable.


Date: August 24, 2021


(SIGNATURE BLOCKS ON FOLLOWING PAGE)

**AMERICAN CIVIL LIBERTIES UNION OF SOUTH CAROLINA**

*D. Allen Chaney Jr.*

Allen Chaney
Federal Bar No. 13181
P.O. Box 20998
Charleston, SC 29413
T: (843) 282-7953
E: achaney@aclusc.org

**SOUTH CAROLINA APPLESEED LEGAL JUSTICE CENTER**

Adam Protheroe
Federal Bar No. 11033
P.O. Box 7187
Columbia, SC 29202
T: (803) 816-0607 | Fax: (803) 779-5951
E: adam@scjustice.org

**DISABILITY RIGHTS SOUTH CAROLINA**

B. Randall Dong (Fed. Ct. ID 5989)
Anna Maria Conner (Fed. Ct. ID 5532)
Amanda C. Hess (Fed. Ct. ID 10303)
3710 Landmark Dr., Suite 208
Columbia, SC 29204
T: (803) 782-0639
E: dong@disabilityrightssc.org
E: conner@disabilityrightssc.org
E: hess@disabilityrightssc.org

**WYCHE, P.A.**

Rita Bolt-Barker
Federal Bar No. 10566
200 East Camperdown Way
Greenville, SC 29601
T: (864) 242-8235 | Fax: (864) 235-8900
E: rbarker@wyche.com

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Louise Melling*
125 Broad St.
New York, NY 10004
T: (212) 549-2637
E: lmelling@aclu.org

Susan Mizner*
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0781
E: smizner@aclu.org

**ARNOLD & PORTER KAYE SCHOLER LLP**

John A. Freedman*
Tara Williamson*
601 Massachusetts Ave, NW
Washington, DC 20001
T: 202.942.5316
E: john.freedman@arnoldporter.com
E: tara.williamson@arnoldporter.com

*Motions to proceed *pro hac vice* forthcoming

*Attorneys for the Plaintiffs*