# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

DISABILITY RIGHTS SOUTH CAROLINA;
ABLE SOUTH CAROLINA; AMANDA
McDOUGALD SCOTT, individually and on
behalf of P.S., a minor; MICHELLE FINNEY,
individually and on behalf of M.F., a minor;
LYUDMYLA TSYKALOVA, individually
and on behalf of M.A., a minor; EMILY
POETZ, individually and on behalf of L.P., a
minor; SAMANTHA BOEVERS, individually
and on behalf of P.B., a minor; TIMICIA
GRANT, individually and on behalf of E.G., a
minor; CHRISTINE COPELAND individually
and on behalf of L.C., a minor; HEATHER
PRICE, individually and on behalf of H.P., a
minor; and CATHY LITTLEJOHN,
individually and on behalf of Q.L., a minor,

                              *Plaintiffs*,

     v.

HENRY McMASTER, in his official capacity
as Governor of the State of South Carolina;
and ALAN WILSON, in his official capacity
as Attorney General of South Carolina;
MOLLY SPEARMAN, in her official capacity
as State Superintend of Education;
GREENVILLE COUNTY SCHOOL BOARD;
HORRY COUNTY SCHOOL BOARD;
LEXINGTON COUNTY SCHOOL BOARD
ONE; OCONEE COUNTY SCHOOL
BOARD; DORCHESTER COUNTY
SCHOOL BOARD TWO; CHARLESTON
COUNTY SCHOOL BOARD; and PICKENS
COUNTY SCHOOL BOARD,

                              *Defendants*.

Civil Action No.: 3:21-cv-2728-MGL

**Governor McMaster's
Memorandum in Opposition to
Plaintiffs' Motion for Temporary
Restraining Order and
Preliminary Injunction and in
Support of Governor McMaster's
Motion to Dismiss**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND .........................................................................................4

LEGAL STANDARDS .................................................................................................5

ARGUMENT ...............................................................................................................6

    I.   None of Plaintiffs' claims is likely to succeed on the merits, and they should all be dismissed...............................................................................................................6

        A.  Plaintiffs' Title II and § 504 claims fail for multiple reasons ..........................6

            1.   Plaintiffs have not alleged any bad faith or gross misconduct by the Governor .....8

            2.   Plaintiffs have not alleged any intentional discrimination by Governor McMaster (or any other Defendant) ...........................................................................................8

                i.   Title II and § 504 permit only claims for intentional discrimination ................9

                    a.   Title VI of the Civil Rights Act—which provides the rights and remedies under Title II and § 504—does not allow a private right of impact for disparate-impact claims ..............................................................................10

                    b.   There is no private right of action for disparate-impact claims under Title II or § 504 ..............................................................................................11

                    c.   Arguments to the contrary are unpersuasive ...............................................14

                    d.   This reasoning also applies to an unintentional-failure-to-accommodate claims under Title II & § 504 ..................................................................18

                ii.  The Complaint contains no allegations of intentional discrimination ............19

            3.   Neither the ADA nor the Rehabilitation Act requires that schools mandate masks ....................................................................................................................21

        B.  ARPA does not affect the legality of the Proviso .........................................27

    II.  Plaintiffs have not established that they are likely to suffer irreparable harm ..................31

    III.  The equities and public interest do not favor an injunction ...............................34

CONCLUSION ...........................................................................................................35

## INTRODUCTION

Throughout the COVID-19 pandemic, public health experts, government officials, families, and individuals have debated how best to respond to this evolving virus. One topic of particularly intense scientific and societal debate has been masks or face coverings. And perhaps in no other context has that debate been as intense as it has on the subject of masks in schools: Should government mandate masks, or should parents have the ultimate decision for their children?

Indeed, this is not even the first lawsuit filed in this State about masks in schools. But it is the first federal lawsuit in this State about masks in schools. The legal theories in this Complaint are different from the ones in the state court cases, but these lawsuits all share a common theme: They seek to have courts do what the plaintiffs could not do through the political process. That said, this action is unique in that Plaintiffs are asking a federal court to set aside or judicially discount the fundamental right, responsibility, and role of all parents to make important, individualized decisions for their children—as well as to enjoin the General Assembly's policy judgments on this subject—under the auspices of important but legally irrelevant federal statutes.

No matter how dressed up, Plaintiffs' attempt to have this Court undo what the General Assembly has done fails. As an initial matter, Plaintiffs do not have a private right of action to assert claims under Title II of the Americans with Disabilities Act or § 504 of the Rehabilitation Act based on a disparate-impact or an unintentional-failure-to-accommodate theory. They can only proceed on an intentional-discrimination theory, but in challenging Proviso 1.108, Plaintiffs do not go so far as accusing Governor McMaster or any other public official of acting (or not acting) in a manner that is even partly motivated by an effort to discriminate against disabled students. Moreover, even if disparate impact or failure to accommodate were viable theories, not allowing

the use of state funds to impose mask mandates does not make schools too dangerous for disabled students to attend or compel a result in which all other students (and parents) are forced to comply with a universal mask requirement. Further still, in a policy debate as intense as this, the Supreme Court has repeatedly cautioned lower courts not to interject themselves into the roles of the other branches of government or the sovereign affairs of States to make policy decisions based on evolving scientific evidence. Plaintiffs' third claim under the American Rescue Plan Act fares no better because at no place in that act did Congress require school districts to impose mask mandates as an unambiguous condition of receiving federal funds.

To be clear, Governor McMaster does not discount the significant individual and societal impacts associated with COVID-19. The Governor has consistently encouraged South Carolinians to heed applicable public health guidance, which has included wearing masks in public settings where it is not possible to practice social distancing, and he has encouraged eligible and willing individuals to get vaccinated. Plaintiffs may prefer that all public schools in South Carolina mandate that all students and teachers wear masks at all times. That is their prerogative, but the fact that the General Assembly has made a different policy judgment does not give rise to a plausible cause of action in federal court. At bottom, Plaintiffs cannot simply litigate their policy preferences or run to court over their disagreements with decisions made by their representatives in the General Assembly. Likewise, this Court is not the proper forum to review or pass judgment upon legislative enactments and the public health and policy decisions they entail.

Beyond these insurmountable hurdles Plaintiffs face, three overarching ideas must be kept in mind when reviewing their Complaint. *First*, from reading the Complaint, one may well get the impression that South Carolina prohibits *masks* in public schools and that no student may wear a mask. That, of course, is not the case. The Proviso simply prohibits mask *mandates* in public

schools.[1] Thus, school officials can certainly encourage but cannot force students to wear masks. Students are free to choose to wear a mask if they want (or their parents want them) to wear a mask.

*Second*, the only logical conclusion of Plaintiffs' claims is a federal school-mask mandate. If Plaintiffs are correct, then every school district—not just in this State but across the country— *must* impose a mask mandate to comply with the Americans with Disabilities Act and the Rehabilitation Act and to accept federal funds under the American Rescue Plan Act. Plaintiffs only overtly attack Proviso 1.108, apparently saying it is then up to school districts to decide "whether to meet their obligations under federal disability rights laws." ECF No. 1, at 2. But under their theory, school districts do not have such a choice because, according to Plaintiffs, mask mandates are necessary for schools to be safe and to comply with recommendations and guidance from public-health officials. Thus, Plaintiffs' argument goes, if a school district does not impose a mask mandate, that district violates Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. That unprecedented theory is at odds with the law and logic.

*Third*, how best to combat COVID-19 has been and continues to be a subject of great debate. But it is a debate for the People, through their elected representatives, to have. Very little about how government responds to COVID-19 requires (or even permits) federal judicial intervention.

---

[1] The Proviso technically does not prohibit mask mandates, but instead it prohibits the use of state-appropriated or authorized funds to enforce or announce a mask mandate. But as the S.C. Supreme Court recognized, while it is theoretically possible that a local government could impose a mask mandate without running afoul of the Proviso, practically speaking, virtually any enforcement or announcement of a mask mandate in a public school would require some use of state-appropriated funds. *See Wilson ex rel. State v. City of Columbia*, ___ S.C. ___, ___ S.E.2d ___, No. 2021-000889, 2021 WL 3928992, at *4 (Sept. 2, 2021).

The Court should therefore grant the Governor's Motion to Dismiss and deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. Even in the face of a global pandemic, courts may not defy well-established legal principles. *See Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring in grant of application for stay) (staying a preliminary injunction regarding absentee voting in South Carolina during COVID-19 that "defied" Supreme Court precedent). Here, those principles support dismissing Plaintiffs' claims and denying their request for injunctive relief.

## FACTUAL BACKGROUND

In the 2021–22 Appropriations Act, the General Assembly prohibited school districts in this State from using appropriated or authorized funds to announce or enforce a mask mandate:

> No school district, or any of its schools, may use any funds appropriated or authorized pursuant to this act to require that its students and/or employees wear a facemask at any of its education facilities. This prohibition extends to the announcement or enforcement of any such policy.

2021 S.C. Acts No. 94, Part IB, § 1.108 ("Proviso"). The Proviso has been challenged in state court, but it remains in effect. *See Wilson ex rel. State*, 2021 WL 3928992. Absent from the Complaint or Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction is any allegation or argument that the General Assembly enacted this Proviso or any state official is enforcing this Proviso for any purpose whatsoever of keeping disabled students from attending school.[2]

---

[2] Indeed, Plaintiffs acknowledge in their Complaint that prior to passage and presentment of the Appropriations Act, which included the challenged Proviso, the General Assembly passed, and Governor McMaster signed into law, legislation requiring public schools in South Carolina to offer full-time, in-person instruction to all students. *See* ECF No. 1, at 14; 2021 S.C. Acts No. 102, § 1 ("For the 2021-2022 School Year, every school district in the State must offer five-day, in-person classroom instruction to students.").

Plaintiffs in this case are nine parents of public-school students who claim to be disabled and two disability-rights interest groups. *See* ECF No. 1, at 4–6. They contend that the Individual Plaintiffs' children are high risk for COVID-19, including the Delta variant. *See* ECF No. 1, at 12–14. With a rising number of COVID-19 cases as schools return, they allege their children cannot safely return to in-person learning if masks are not mandated for everyone in the schools (teachers, staff, students, etc.). *See* ECF No. 1, at 20–25. They demand that schools be allowed to adopt mask mandates, based on recommendations from the Centers for Disease Control and Prevention ("CDC") and S.C. Department of Health and Environmental Control ("DHEC"). *See* ECF No. 1, at 2.

Based on these allegations, Plaintiffs assert three claims. Their first two are similar, under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act of 1973. *See* ECF No. 1, at 25–29. Their third claim is based on the American Rescue Plan Act of 2021 ("ARPA"), claiming that a section of that act preempts the Proviso. *See* ECF No. 1, at 29–32. They seek declaratory and injunctive relief. *See* ECF No. 1, at 32.

They have moved for a temporary restraining order and preliminary injunction. *See* ECF No. 16. Governor McMaster, meanwhile, is moving to dismiss the Complaint.

## LEGAL STANDARDS

A motion to dismiss should be granted whenever a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim, "a plaintiff must plead enough factual allegations 'to state a claim to relief that is plausible on its face.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court must accept only "well-pleaded allegations" "as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Harrell v. Freedom Mortg. Corp.*, 976 F.3d

434, 439 n.5 (4th Cir. 2020) (internal alteration omitted). But the Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Plaintiffs must "allege facts sufficient to state all the elements of [their] claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

"A preliminary injunction is an extraordinary and drastic remedy" and "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotation mark omitted). A plaintiff must satisfy four elements to obtain a preliminary injunction: (1) likelihood of success on the merits, (2) irreparable harm, (3) the balance of the hardship tips in his favor, and (4) an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[3] A request for preliminary injunctive relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "The substantive standards for granting a request for a temporary restraining order and entering a preliminary injunction are the same." *S.C. Progressive Network Educ. Fund v. Andino*, 493 F. Supp. 3d 460, 465 (D.S.C. 2020).

## ARGUMENT

**I.    None of Plaintiffs' claims is likely to succeed on the merits, and they should all be dismissed.**

### A.    Plaintiffs' Title II and § 504 claims fail for multiple reasons.

Plaintiffs' first claim is under Title II of the ADA. In short, their theory is that by not requiring masks in public schools, Defendants are denying disabled students the opportunity to participate in-person in public schools. *See* ECF No. 1, at 26–27. Their second claim is essentially the same, except that it is under § 504 of the Rehabilitation Act, rather than under the ADA. *See*

---

[3] The Governor cites materials outside of the Complaint in this Memorandum only in the context of responding to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

ECF No. 1, at 28–29. No matter how framed, Plaintiffs are mistaken. *Cf. Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 n.4 (4th Cir. 2016) ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same.").

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II, plaintiffs must prove three elements: "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Lamone*, 813 F.3d at 503. As for causation on the third element, a Title II claim requires plaintiffs to prove that disability was a "motivating factor" in the denial. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005).

Meanwhile, § 504 declares, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The elements of this claim are generally the same as a Title II claim. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). The causation part of the third element, however, is different. For a § 504 claim, a plaintiff must prove the discriminatory conduct was "solely" based on the plaintiff's disability. *Constantine*, 411 F.3d at 498 n.17.

1.    **Plaintiffs have not alleged any bad faith or gross misconduct by the Governor.**

There is a simple reason that the Court can quickly reject Plaintiffs' Title II and § 504 claims: They have not alleged the very thing the Fourth Circuit has said is necessary for these claims to prevail.

In "the context of education of handicapped children," "either bad faith or gross misjudgment should be shown before a § 504 violation can be made out." *Sellers by Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524, 529 (4th Cir. 1998). This same rule applies to Title II claims. *See, e.g.*, *Q. C. v. Winston-Salem/Forsyth Cty. Sch. Bd. of Educ.*, No. 1:19CV1152, 2021 WL 1430697, at *6 (M.D.N.C. Apr. 15, 2021); *O.V. v. Durham Pub. Sch. Bd. of Educ.*, No. 1:17CV691, 2018 WL 2725467, at *23 (M.D.N.C. June 6, 2018), *report and recommendation adopted*, No. 1:17-CV-691, 2018 WL 3370644 (M.D.N.C. July 10, 2018).

Plaintiffs allege neither bad faith nor gross misconduct. *See generally* ECF No. 1. This is not a surprise. The S.C. Supreme Court has already held that the General Assembly enacted the Proviso "in good faith." *Wilson*, 2021 WL 3928992, at *1. As even Plaintiffs recognize, the Governor's consistent message about masks in schools is that parents should have the ultimate say in whether their children wear masks. *See* ECF No. 1, at 16–17, and the Supreme Court of South Carolina has confirmed that is precisely what the Proviso permits, *see Wilson*, 2021 WL 3928992, at *1 ("While allowing school districts flexibility to encourage one policy or the other, the state legislature has elected to leave the ultimate decision to parents.").

2.    **Plaintiffs have not alleged any intentional discrimination by Governor McMaster (or any other Defendant).**

Plaintiffs never specify the particular theory on which their Title II and § 504 claims are based. The lack of any allegations about intentional discrimination suggests Plaintiffs' claims are

founded on a disparate-impact or unintentional-failure-to-accommodate theory. But there is no private right of action for such claims after *Alexander v. Sandoval*, 532 U.S. 275 (2001).

### i.    Title II and § 504 permit only claims for intentional discrimination.

As a starting point, it is important to be clear what the Fourth Circuit has held and what the Fourth Circuit has not held. The Fourth Circuit has observed that "Title II allows plaintiffs to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations."[4] *Lamone*, 813 F.3d at 503. And the Fourth Circuit has said that "the ADA and the Rehabilitation Act do more than simply provide a remedy for intentional discrimination," given congressional intent. *Id.* at 510. Admittedly, at first glance, that language would appear to foreclose the Governor's argument here.

But a more careful reading of the case law shows it does not. For one, the Fourth Circuit's passing reference to the ADA and Rehabilitation Act "do[ing] more than simply provid[ing] a remedy" is merely dicta. *See United States v. Freeman*, 741 F.3d 426, 438 (4th Cir. 2014) ("Dicta is not binding on anyone for any purpose." (quoting *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010))). For another, the Fourth Circuit has never expressly considered the impact of *Sandoval* on disparate-impact claims under Title II and § 504. *See United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The [issue] was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not binding precedent on this point."); *see also United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019) ("[U]nder our

---

[4] Disparate treatment or intentional discrimination is "the most easily understood type of discrimination," and occurs when someone "has treated a particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (cleaned up). Disparate impact occurs when acts "that are not intended to discriminate but in fact have a disproportionately adverse effect" on a protected group. *Id.*

adversarial system of justice, an unchallenged and untested assumption is simply not a holding that binds future courts."). Thus, this Court must undertake the requisite analysis of *Sandoval*'s impact, both in determining whether Plaintiffs have alleged a plausible claim for relief and in assessing whether they have demonstrated a clear likelihood of success on the merits.

> a. **Title VI of the Civil Rights Act—which provides the rights and remedies under Title II and § 504—does not allow a private right of impact for disparate-impact claims.**

To understand the argument that there is no private right of action for disparate-impact or failure-to-accommodate claims under Title II or § 504, it is important to start with the Supreme Court's decision in *Sandoval* about disparate-impact claims under Title VI. That case asked whether a plaintiff had a private right of action to enforce a regulation implementing Title VI of the Civil Rights Act of 1964. *See Sandoval*, 532 U.S. at 279. At the beginning of its analysis, the Supreme Court noted three "given[s]" regarding § 601 of Title VI.[5] *Id.* First, "private individuals may sue to enforce § 601." *Id.* at 280. Second, "§ 601 prohibits only intentional discrimination." *Id.* Third, the Court "assume[d]" for purposes of that case that "regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601" because the petitioners in that case did not challenge the regulations themselves, but only the ability of a private plaintiff to bring a claim based on the regulations. *Id.* at 281.

---

[5] Section 601 provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964, Pub. L. 88-352, Title VI, § 601, 78 Stat. 241, 252 (July 2, 1964) (codified at 42 U.S.C. § 2000d). Section 602 provides the executive branch with the authority to enact regulations to enforce § 601. *Id.*, Title VI, § 602, 78 Stat. at 252–53 (codified at 42 U.S.C. § 2000d-1).

Against that background, the Court considered whether regulations from the Department of Justice gave plaintiffs a private right of action against the director of the Alabama Department of Public Safety to challenge an Alabama law that mandated driver's license tests be given only in English as having a disparate impact based on national origin. Whether a private right of action exists turns on whether Congress intended to create that right. *Id.* at 286. In § 601, the *Sandoval* Court explained, Congress did not intend to create a private right of action for disparate-impact claims because § 601 does not forbid conduct that has a disparate impact. *Id.* at 284–85.

Thus, if a private right of action based on a disparate-impact theory were to exist, it must come "from the independent force of § 602" and the power of federal departments and agencies to enact regulations to enforce § 601. *Id.* at 286. Looking to the "text and structure of Title VI," the Court held no such private right of action exists based on multiple reasons. *Id.* at 288. One, § 602 lacks the "rights-creating language" of § 601 that "no person shall be subject to discrimination." *Id.* (cleaned up). Two, § 602 simply gives federal departments and agencies the authority to issue regulations. *Id.* at 289. Three, rather than speaking to the people protected or even the people being regulated, § 602 addresses the federal government. *Id.* Four, § 602 establishes a process for federal departments and agencies to enforce their regulations. *Id.* at 289–91. And five, the Court rejected the idea that regulations—rather than acts of Congress—can have the necessary rights-creating language to establish a private right of action. *Id.* at 291.

        **b.**     **There is no private right of action for disparate-impact claims under Title II or § 504.**

Turn now to Title II of the ADA and § 504 of the Rehabilitation Act. For five reasons, these two statutes also do not provide a private right of action for disparate-impact claims.[6]

---

[6] It is worth noting that the Ninth Circuit recently interpreted § 504 as permitting these claims. *See Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020). The Supreme Court has granted

*First*, there is the structure for remedying violations of Title II and § 504. On this point, *Sandoval* is important because Title II and § 504 ultimately look to Title VI for their enforcement mechanisms. Title II provides that the "remedies, procedures, and rights set forth in" the Rehabilitation Act "shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation" of § 12132. 42 U.S.C. § 12133. The Rehabilitation Act, in turn, declares that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance" under § 504. 29 U.S.C. § 794a(a)(2). Thus, the remedies, rights, and procedures under Title VI govern what remedies, rights, and procedures exist under Title II and § 504. In other words, Title VI governs what claims a plaintiff may bring under Title II and § 504 because a claim necessarily requires that there be a right for which there is a remedy. As one Ninth Circuit judge recently put, under this "domino effect," "[i]f Title VI does not allow a disparate impact claim, then the Rehabilitation Act cannot (because it derives its remedies and rights from Title VI), and the ADA cannot either (because it, in turn, relies on the Rehabilitation Act for its remedies and rights)." *Payan v. Los Angeles Cmty. Coll. Dist.*, ___ F.4th ___, No. 19-56111, 2021 WL 3730692, at *12 (9th Cir. Aug. 24, 2021) (Lee, J., dissenting).

*Second*, there is the text of both Title II and § 504. *Cf. BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1537 (2021) (statutes must be interpreted based on plain meaning of the text). Title II prohibits discrimination "by reason of such disability," 42 U.S.C. § 12132, and § 504 similarly prohibits discrimination "solely by reason of [a person's] disability," 29 U.S.C.

---

certiorari to decide this Term whether § 504 provides a disparate-impact cause of action for plaintiffs alleging disability discrimination. *See CVS Pharmacy, Inc. v. Doe*, No. 20-1374 (U.S.).

§ 794. "By reason of" means "because of" or "due to." *By reason of*, Merriam-Webster (2021), https://tinyurl.com/cn5wm7rd; *see also Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018) ("And 'by reason of' is a 'quite formal' way of saying 'because of.'" (internal alteration omitted)). An act (i.e., discrimination) done "because of" something (i.e., a disability) "requires [an] intentional" decision. *Payan*, 2021 WL 3730692, at *10. Put another way, a disability must motivate (not simply be the result of) a decision for conduct to fall within the scope of Title II and § 504. This is especially true of § 504, given its use of "solely." *Cf. Wimberly v. Lab. & Indus. Rels. Comm'n of Mo.*, 479 U.S. 511, 517 (1987) (neutral application of a rule cannot result in a decision "solely on the basis of pregnancy").

*Third*, there is the similarity between the text of Title II and § 504 and the text of Title VI. Both Title II and § 504 have "rights-creating language" that mirrors § 601 of Title VI. *See Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 509 (1983) ("§ 504 was patterned after Title VI"); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1191 n.19 (11th Cir. 2007) ("Title II . . . was modeled after § 601"). To be sure, Title VI uses "on the ground of," rather than "by reason of," *see* 42 U.S.C. § 2000d, but this is a distinction without a difference, *see Ground*, Merriam-Webster (2021), https://tinyurl.com/ad3jhtba (defining "ground" as "a basis for . . . action"). Because Title VI's language does not create a private right of action for disparate-impact claims, *see Sandoval*, 532 U.S. at 284–85, neither can Title II or § 504's language.

*Fourth*, there is the contrast between the language of Title II and § 504 and the language Congress uses when Congress has prohibited disparate-impact discrimination. To prohibit that type of discrimination, Congress "has relied on language like 'otherwise adversely affect' or 'otherwise make unavailable,' which refers to the consequences of an action rather than the actor's intent." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 242 (6th Cir. 2019) (Sutton, J.).

The Age Discrimination in Employment Act ("ADEA"), for instance, uses "otherwise adversely affect," 29 U.S.C. § 623, and the Supreme Court pointed to that language to hold that the ADEA permits disparate-impact claims, *see Smith v. City of Jackson*, 544 U.S. 228, 235–36 (2005). The same is true of Title VII of the Civil Rights Act, *see* 42 U.S.C. § 2000e-2; *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and the Fair Housing Act, *see* 42 U.S.C. § 3604; *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015). Unlike these statutes, Title II and § 504 do not use sweeping language like "otherwise affected," so Title II and § 504 do not provide for disparate-impact claims. *See Doe*, 926 F.3d at 242.

*Fifth*, there are the internal differences in the ADA. Title I of the ADA focuses on employment and prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title I then goes on to define "discriminate" to include "utilizing standards, criteria, or methods of administration that *have the effect of* discrimination on the basis of disability," much like the language in Title VII of the Civil Rights Act or the Fair Housing Act. *Id.* § 12112(b)(3)(A) (emphasis added). That definition means that disparate-impact claims exist under Title I. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). Title II of the ADA, on the other hand, has no such provision defining "discriminate" as an act that "has the effect of." *See id.* § 12131 (providing definitions for Title II). Title II prohibits only discrimination "by reason of such disability," which (as discussed already) does not include disparate-impact claims.

### c.     Arguments to the contrary are unpersuasive.

In the face of all of these arguments, some courts have nevertheless strained to hold that disparate-impact claims under Title II and § 504 survive *Sandoval*. *See Payan*, 2021 WL 3730692,

at *4–7 (majority op.); *Robinson v. Kansas*, 295 F.3d 1183, 1187 (10th Cir. 2002), *abrogated on other grounds by Arbogast v. Kan. Dep't of Lab.*, 789 F.3d 1174 (10th Cir. 2015). These courts have made similar mistakes. For one, they rely on *Alexander v. Choate*, 469 U.S. 287 (1985), in which the Supreme Court considered a Tennessee law about how many inpatient-hospital days were covered under its Medicaid program. To be sure, the *Choate* Court noted that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent." *Id.* at 296–97. Nevertheless, the Court did not actually answer the question of whether disparate-impact claims exist under the Rehabilitation Act. Instead, it "*assume[d]* without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped."[7] *Id.* at 299 (emphasis added). *Choate* therefore did not settle the question here, and the heavy reliance on it by the Ninth and Tenth Circuits is misplaced. *See L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 38; *see also Doe*, 926 F.3d at 243 (noting that *Choate* did not decide this question).

For another, courts like the Ninth and Tenth Circuits have put great weight on what they perceive to be the purpose of Title II and § 504. *See Payan*, 2021 WL 3730692, at *4; *Robinson*, 295 F.3d at 1187. These courts "overlooked the essentially identical text of Title VI and § 504 [and Title II], elevating the purpose of § 504 [and Title II] in light of the different aim of the Rehabilitation Act [and the ADA] as well as the different context in which the Act[s] w[ere] passed." *Doe*, 926 F.3d at 243 (internal quotation marks omitted). Of course, a judicially glossed

---

[7] Moreover, the *Choate* Court's assumption was based on a dubious reading of legislative history, drawing on the statements of only a few members of Congress and previous legislative efforts. *See* 469 U.S. at 296 n.13; *see also NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) ("ambiguous legislative history" may never be used "to muddy clear statutory language," and "floor statements by individual legislators rank among the least illuminating forms of legislative history" (cleaned up)); *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 422 (2012) (noting "the perils of relying on the fate of prior bills to divine the meaning of enacted legislation").

purpose cannot control over the plain text of a statute. *See, e.g.*, *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 557 (2010) (Scalia, J., concurring in part and concurring in the judgment). And even the *Choate* Court—while assuming that § 504 could reach some disparate-impact issues—recognized that "there is . . . reason to question whether Congress intended § 504 to embrace all claims of disparate-impact discrimination," given the "wholly unwieldy administrative and adjudicative burden" that it could create, and the Court accordingly "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under § 504." 469 U.S. at 298–99.

For a third, the Ninth Circuit's recent decision ignores *Sandoval* and misreads § 601. That court contended that "Title VI's limitation to only intentional discrimination is not based on the statutory text of the Civil Rights Act." *Payan*, 2021 WL 3730692, at *5. But as just discussed, § 601 prohibits discrimination "on the ground of" certain characteristics. That means discrimination based on an intentional act. In any event, the Supreme Court has said that § 601 prohibits only intentional discrimination. *See Sandoval*, 532 U.S. at 279; *see also Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003) (*Sandoval* makes "clear that § 601 prohibits only intentional discrimination, not 'disparate impact' practices"). In fact, the *Choate* Court even said as much, observing that "Title VI itself directly reache[s] only instances of intentional discrimination" and only the regulations implementing Title VI redress disparate-impact situations. 469 U.S. at 293. However another circuit court might interpret the scope of Title VI, the Supreme Court gets the final word on this question.

Therefore, no compelling reason exists that disparate-impact claims under Title II or § 504 survive *Sandoval*. That may be good policy. It may not be. But it is a policy choice that Congress gets to make. *See Sandoval*, 532 U.S. at 286–87 ("Without [congressional intent to create a cause

of action], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.").

Courts cannot substitute their judgment for Congress's judgment to imply a private right of action. Decades ago, the Supreme Court believed that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964). No longer. The Court has "sworn off the habit of venturing beyond Congress's intent," and the Court has made clear it "will not accept [an] invitation to have one last drink." *Sandoval*, 532 U.S. at 287. Now, the Court "assume[s] that Congress will be explicit if it intends to create a private cause of action." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017). This Court should follow the Supreme Court's current jurisprudence on implied private rights of action and its clear holding in *Sandoval* and conclude that a private right of action does not exist for disparate-impact claims under Title II and § 504.

At a minimum, the Court should conclude that Plaintiffs have not made—and cannot make—the requisite clear showing that they are likely to succeed in their efforts to advance a private right of action for disparate-impact claims under Title II and § 504 claims post-*Sandoval*. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) ("Respondents, however, are not sufficiently likely to prevail on the question whether Congress has authorized the District Court to enforce § 303 in an action brought by a private litigant to justify the issuance of a TRO." (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002); *Sandoval*, 532 U.S. at 286); *Wise v. Circosta*, 978 F.3d 93, 103 (4th Cir. 2020) ("And even if reasonable minds can disagree on the merits, an injunction is still inappropriate here."). Accordingly, the Court should deny Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction.

         **d.**      **This reasoning also applies to an unintentional-failure-to-accommodate claims under Title II and § 504.**

This discussion, following *Sandoval*'s lead, has focused on disparate-impact claims. But this logic applies with equal force to a claim based on failure to accommodate as well, at least if the alleged failure was not intentional.[8]

The ADA-based obligation to accommodate is found in the regulations enacted under 42 U.S.C. § 12134, not under the congressionally imposed prohibition in § 12132. *See, e.g.*, 28 C.F.R. § 35.130(B)(7). Thus, this is just like the regulation in *Sandoval* enacted under § 602, when § 601 did not prohibit disparate-impact discrimination. The Rehabilitation Act-based obligation is likewise found only in the regulation. *See* 34 C.F.R. § 104.4(b)(4). This regulation cites § 504 as its source of authority, but as discussed at length already, § 504 is patterned on § 601 and does not prohibit disparate-impact discrimination. Like the Department of Justice in *Sandoval*, which could not create a private right of action based on something Congress had not prohibited, neither can the Department of Education do so here. *See* 532 U.S. at 291 ("Agencies may play the sorcerer's apprentice but not the sorcerer himself."). Therefore, just as the regulations do not provide a private right of action for disparate impact, neither do they permit a private right of action for an unintentional failure to accommodate. In other words, the only viable claim under Title II and § 504 is one based on intentional discrimination, which Plaintiffs do not allege here.

In the Western District of Tennessee decision on which Plaintiffs rely, the court held that those plaintiffs could bring, and had brought, a failure-to-accommodate claim. *See G.S. by & through Schwaigert v. Lee*, ___ F. Supp. 3d ___, No. 21-CV-02552-SHL-ATC, 2021 WL 4057812,

---

[8] A deliberate failure-to-accommodate claim is nothing more than an intentional-discrimination claim. *See, e.g.*, *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743 (2017) (involving Title II and § 504 claims after a school refused to accommodate the request of a student with cerebral palsy to bring her service dog to school).

at *7 (W.D. Tenn. Sept. 3, 2021). For at least two reasons, that is not helpful to Plaintiffs here. In the first place, the defendants in the Tennessee case focused on Eleventh Amendment immunity, not a private right of action. *See* Response 11–12, *G.S. v. Lee*, No. 2:21-cv-2552 (W.D. Tenn. Aug. 30, 2021), ECF No. 24. In the second, the Tennessee court's analysis is flawed. What those plaintiffs (and Plaintiffs here) challenge is a self-executing legislative act advanced for a nondiscriminatory reason—the Proviso, which lets parents decide whether their children wear masks—that allegedly "disproportionately harms" disabled students. *Doe*, 926 F.3d at 241. No matter how Plaintiffs spin it, their claim is fundamentally a disparate-impact one. In their 105-paragraph Complaint, a version of "accommodate" appears only five times, and a version of "modify" only three. *See* ECF No. 1. They really complain that a facially neutral policy is, they say, more harmful to disabled students than to nondisabled students. That is the *sine qua non* of a disparate-impact claim. *See Ricci*, 557 U.S. at 577.

### ii.    The Complaint contains no allegations of intentional discrimination.

Despite regulations not creating private rights of action on disparate-impact and unintentional-failure-to-accommodate theories, that appears to be how Plaintiffs have framed their claims. After an initial reference to Title II and § 504, *see* ECF No. 1, at 26, 28, Plaintiffs then rely heavily on federal regulations, *see* ECF No. 1, at 26–27 (Title II claim), 28–29 (§ 504 claim). Fatally for their Title II and § 504 claims, nowhere in their Complaint do Plaintiffs contend that anyone (much less the Governor) intentionally discriminated against them. All they challenge is a neutral policy that applies to everyone, but "the application of a neutral rule that applies to disabled and nondisabled individuals alike cannot be considered discrimination on the basis of disability." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 n.6 (4th Cir. 1999).

Starting with the § 504 claim, Plaintiffs must plausibly allege that their supposed exclusion from public school is "solely" based on intentional discrimination on account of their disabilities. 29 U.S.C. § 794(a); *see also Constantine*, 411 F.3d at 498 n.17. They have not alleged anything of the kind. *See generally* ECF No. 1. These claims must therefore be dismissed. *See, e.g.*, *Straw v. United States*, No. CV 3:19-2531-JMC-PJG, 2019 WL 9673370, at *3 (D.S.C. Oct. 31, 2019) (recommending dismissal of a § 504 claim because the "Plaintiff provides no plausible allegation that he was discriminated against based solely on his disability"), *report and recommendation adopted*, No. 3:19-CV-02531-JMC, 2020 WL 3496552 (D.S.C. June 29, 2020), *aff'd*, 822 F. App'x 207 (4th Cir. 2020); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (a complaint cannot "survive a motion to dismiss when it fails to allege essential elements of a plaintiff's claim").

Turning to the Title II claim, Plaintiffs must plausibly allege that their disabilities were a "motivating" cause of the Proviso's prohibition on the use of state-authorized or -appropriated funds to implement mask mandates. *Constantine*, 411 F.3d at 498 n.17. Once again, Plaintiffs have not alleged that. *See generally* ECF No. 1. So once again, that failure is fatal. *See, e.g.*, *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 751 (4th Cir. 2018) (affirming the dismissal of a Title II claim because the plaintiffs "failed to plead that any . . . alleged disability motivated the" defendants' actions); *see also id.* ("Because the [plaintiffs] failed to state a viable ADA claim, they failed to state a cognizable Rehabilitation Act claim.").

Plaintiffs' failure to allege these causation standards and intentional discrimination is understandable. Masks are the subject of great debate. The Governor has been consistent in his position: Parents know what is best for their children. *See, e.g.*, ECF No. 1, at 16–17; Joseph Bustos & Maayan Schechter, *Let Parents Make Decision Whether to Mask Their Child in School, S.C.*

*Gov. McMaster Says*, The State (Aug. 22, 2021), https://tinyurl.com/vyu3rf5j; Exec. Order No. 2021-23, § 2(I) (May 11, 2021) (directing DHEC to provide a form for parents to opt their children out of any school mask mandate). Moreover, Plaintiffs have not (presumably because they cannot) pointed to anything that suggests the General Assembly was motivated by any animus toward Plaintiffs or students with disabilities generally when it enacted the Proviso or that anyone seeking to enforce the Proviso is intentionally discriminating against Plaintiffs. Indeed, any allegation that the Governor or any other state official was motivated by a discriminatory intent is untenable and would likely violate Rule 11. But without those allegations, Plaintiffs' Title II and § 504 claims fail as a matter of law.

### 3.    Neither the ADA nor the Rehabilitation Act requires that schools mandate masks.

Even if Plaintiffs could proceed on Title II and § 504 claims based on something other than intentional discrimination, they still lose. Turning to whether Plaintiffs have been denied anything, Plaintiffs cite myriad provisions of the Code of Federal Regulations, but their argument essentially boils down to this syllogism: Schools are not safe without masks. Disabled students cannot attend or learn in a school that is not safe. Therefore, Plaintiffs cannot be in schools without universal mask mandates. *See* ECF No. 16-1, at 14–16. There are at least three problems with Plaintiffs' argument.

1.    The first problem is that the major premise of the syllogism is not obviously correct. Plaintiffs rely on a declaration from Dr. Robert Saul, *see* ECF No. 16-2, and recommendations from the CDC, DHEC, and groups like the American Academy of Pediatrics, *see* ECF No. 16-1, at 3, to say schools are not safe without universal mask requirements. They present as gospel truth that mask mandates stop COVID-19 from spreading.

Masks may help, but they may not be the savior Plaintiffs portray them to be. For example, a CDC study released in May 2021 found that the difference in the rate of COVID-19 cases "in schools that required mask use among students was not statistically significant compared with schools where mask use was optional." Jenna Gettings, et al., *Mask Use and Ventilation Improvements to Reduce COVID-19 Incidence in Elementary Schools*, Ctrs. for Disease Control & Prevention (May 28, 2021), https://tinyurl.com/4ftx4asx. Current events are proving this true. As one example, Richland School District 1 has a mask mandate for all schools (apparently in violation of the Proviso), but early this school year, it had more COVID-19 cases than Richland School District 2, which does not have a mask mandate in high schools (but does in elementary and middle schools) and has more students than Richland 1. *See* Lucas Daprile, *A Lone Midlands School District Has a COVID Mask Mandate. Does it Have Fewer Cases?*, The State (Aug. 26, 2021), https://tinyurl.com/mrshxdfn.

In addition to the debate over whether masks are effective at preventing the spread of COVID-19 in schools, there is also evidence that masks may cause other harms to students. One example of this harm comes from a study on which Plaintiffs' own expert relies. *See* ECF No. 16-2, at 11 (citing Jeremy Howard, *et al.*, *An Evidence Review of Face Masks Against COVID-19*, 118 PNAS 1 (2021), https://tinyurl.com/yv5w8z94). That study observed that an issue that impacts "schools" "is that over a full day's use, masks may become wet, or dirty." Howard, *supra*, at 9. Studies of this issue in healthcare settings have "found that respiratory pathogens on the outer surface of the used medical masks may result in self-contamination, and noted that the risk is higher with longer duration of mask use." *Id.* (internal quotation marks omitted). Another potential harm is to education and development. Thus, in Great Britain, rather than impose universal mask mandates during the Delta surge, British schools focused on other preventive measures, such as

frequent testing, because decisionmakers from both political parties in Great Britain believe it is important for social development that students see the faces of their fellow students. *See* Dana Goldstein, *In Britain, Young Children Don't Wear Masks in Schools*, N.Y. Times (Aug. 27, 2021), https://tinyurl.com/b4d7cz5s.

On top of all of this, the plaintiffs in the various challenges to the Proviso cannot even agree among themselves whether masks make schools safe for students with disabilities. Many Plaintiffs in this case contend that if masks were mandatory, their children would be safe at school. *See, e.g.*, ECF No. 16-4, at 2; ECF No. 16-5, at 2. But in one of the cases challenging the Proviso in the S.C. Supreme Court, a lawyer for a parent of an Orangeburg County student admitted under questioning from the court that the parent still might not be willing to send her child with a respiratory disability back to school, even if masks were mandated. *See* Argument Video at 16:10–16:32, *Richland Cty. Sch. Dist. 2 v. Lucas*, No. 2021-000892 (S.C.), https://tinyurl.com/49afe94n.

In situations like this, when the scientific evidence is evolving, courts may not interject themselves in a decisionmaking process that belongs to the political branches. As Chief Justice Roberts observed earlier in this pandemic, "[o]ur Constitution principally entrusts the safety and health of the people to the politically accountable officials of the States to guard and protect." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Robert, C.J., concurring in denial of application for injunctive relief) (internal quotation marks omitted). These officials have "especially broad" "latitude" when they "act in areas fraud with medical and scientific uncertainties." *Id.* In making decisions involving medical and scientific uncertainties, these officials "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* at 1614 (internal quotation marks omitted).

In this case, that means that decisions about masks in schools must be left to the political process. Under South Carolina law, the General Assembly has the authority to prohibit state-appropriated funds from being used to enforce or announce mask mandates in public schools. *See Wilson ex rel. State*, 2021 WL 3928992, at *3. If the People want decisions about masks made at a different level of government, then they can contact their legislators and lobby the General Assembly to repeal or amend the Proviso. Whatever ultimately happens with masks in schools, the decision belongs to the political branches, not the courts. *See id.* ("[W]e [the judicial branch] do not, and cannot, set public policy ourselves. Instead, the people of South Carolina, through their elected state representatives, set the state's policy."); *see also Schuette v. BAMN*, 572 U.S. 291, 313 (2014) ("It is demeaning to the democratic process to presume that the voters are not capable of deciding an issue of this sensitivity on decent and rational grounds.").

Beyond the uncertainty and disputes regarding masks, Plaintiffs ignore all of the other safety precautions that exist. *See SCDHEC COVID-19 Guidance for K-12 Schools: 2021-2022 Academic Year* 6–10, S.C. Dep't of Health & Envtl. Control (Sept. 7, 2021), https://tinyurl.com/br7mdeac (describing "layered prevention strategies" for schools). Social distancing. Hand washing. Ventilation. Vaccines for people 12 and older. And, lest we forget, masks. Anyone—including Plaintiffs' children and other disabled students—is free to wear a mask (surgical, cloth, or N95) in school.

Other mitigation efforts in place mean that a universal mask mandate is not a reasonable accommodation that school districts must make. For instance, a disability-rights group sued the Idaho legislature regarding its COVID-19 protocols, which did not require mask wearing. *See Selene v. Legislature of Idaho*, 514 F. Supp. 3d 1243 (D. Idaho 2021). The federal district court in that case denied the motion for a preliminary injunction, noting all of the other precautions (such

as social distancing, air purifying, and hand-sanitizer stations) that had been taken. *Id.* at 1256–57. Following this line of thought are other parents of students with disabilities. In Charlottesville, Virginia, for instance, parents have relied on schools' other mitigation efforts in demanding that their disabled students not have to wear masks. *See* Katherine Knott, *Albermarle Mask Policy Keeps Some Students with Disabilities Out of Buildings*, Daily Progress (Aug. 31, 2021), https://tinyurl.com/yeafnxju.

2.     The second problem with Plaintiffs' argument is that it is irreconcilable with the frequent statements that disability-rights advocates have made since early in this pandemic that many people with disabilities cannot wear masks and should be excluded from mask mandates. Multiple disabled plaintiffs have challenged mask mandates, demanding that they not be subject to those mandates under the ADA. *See, e.g.*, *Hernandez v. Roche*, No. 3:20-CV-00263-DCG, 2021 WL 3701861 (W.D. Tex. Aug. 19, 2021); *Emanuel v. Walt Disney Co.*, No. 5:20-CV-04639, 2021 WL 2454462 (E.D. Pa. June 16, 2021); *Giles v. Sprouts Farmers Mkt., Inc.*, No. 20-CV-2131-GPC-JLB, 2021 WL 2072379 (S.D. Cal. May 24, 2021); *Lewis v. Walmart Corp.*, No. 20-CV-2836, 2021 WL 963810 (N.D. Ill. Mar. 15, 2021); *Pletcher v. Giant Eagle Inc.*, No. CV 2:20-754, 2020 WL 6263916 (W.D. Pa. Oct. 23, 2020); *see also* Elizabeth Pendo et. al., *Resolving Tensions Between Disability Rights Law and Covid-19 Mask Policies*, 80 Md. L. Rev. Online 1, 10 (2020) (arguing that wearing masks is a burden or problem for many people with disabilities). What matters for purposes of this case is not whether these other plaintiffs won or lost but rather the fact that they brought these claims in the first place. They claimed their disability prevented them from wearing masks, in stark contrast with Plaintiffs who insist children with disabilities—and indeed all people—must be wearing masks in school. Nothing about these other cases is unusual. Even the CDC's own guidance says that a "a person with a disability who cannot wear a mask, or cannot

safely wear a mask, for reasons related to the disability" should not be required to wear a mask. *Guidance for Wearing Masks*, Ctrs. for Disease Control & Prevention (Apr. 19, 2021); *see also* Knott, *supra* (describing parents who want their disabled students not to be required to wear a mask).

      3.     The third problem with Plaintiffs' argument is its logical conclusion: a federal mask mandate in schools. To be sure, Plaintiffs only request that the Proviso be enjoined and declared unlawful. *See* ECF No. 1, at 32; ECF No. 16, at 2. But take the next logical—and unavoidable— step. Once there is no statewide prohibition on mask mandates, then Plaintiffs will look to the school districts around the State, and if they do not start requiring masks, all of the arguments Plaintiffs make against the Governor, the Attorney General, and the Superintendent of Education will be made against local school officials. Then go beyond South Carolina. What is true of Title II and § 504 in Columbia is true of Title II and § 504 in St. Louis. And what is true of Title II and § 504 in Charleston is true of Title II and § 504 in Oakland. Put another way, federal law applies the same way in all 50 states. Thus, every school district in the United States would have to require masks in schools under Plaintiffs' theory. Such an absurd result cannot stand. It is not found in the plain text of either statute, *see Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (statutes should be interpreted based on the ordinary meaning of the words), and could not have been Congress's intent, *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (courts can consider congressional intent when interpreting statutes). Such sweeping expansions of federal power during this pandemic cannot be—and have not been—tolerated. *Cf. Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, ___ S. Ct. ___, No. 21A23, 2021 WL 3783142, at *1 (U.S. Aug. 26, 2021) (vacating stay of injunction pending appeal of CDC's eviction moratorium because "the

applicants are virtually certain to succeed on the merits of their argument that the CDC has exceeded its authority").

**B.    ARPA does not affect the legality of the Proviso.**

Plaintiffs' third claim is that § 2001(e)(2)(Q) of ARPA requires that States permit school districts to require masks in public schools. This claim fails because Congress has not unambiguously imposed that condition on school districts that receive ARPA funds.

As an initial matter, no one disputes that federal law is supreme. *See* U.S. Const. art. VI, cl. 2. But federal law only preempts state law in certain instances. It occurs when Congress expressly preempts state law (express preemption), when Congress impliedly preempts state law by regulating so pervasively that Congress has regulated the entire field (field preemption), or when federal and state law actually conflict (conflict preemption). *See Washington Gas Light Co. v. Prince George's Cty. Council*, 711 F.3d 412, 419–20 (4th Cir. 2013).

Plaintiffs attempt to frame their claim as based on preemption, but really, their arguments appear to be premised on Congress's power under the Spending Clause. *See* U.S. Const. Art. I, § 8, cl. 1. Plaintiffs rely on § 2001(e)(2)(Q) of ARPA for this claim. *See* ECF No. 1, at 30. That provision imposes certain requirements on elementary and secondary schools that receive federal funds under ARPA. It does not (as in typical preemption cases) establish some provision of federal law that all people must comply with, and Plaintiffs do not and cannot plausibly argue that ARPA's text or scope expressly or implicitly preempt state law. Thus, their claim is governed by *South Dakota v. Dole*, 483 U.S. 203 (1987), and congressional authority to impose conditions on recipients of federal funds.

As the Supreme Court has recognized, "Congress may attach conditions on the receipt of federal funds." *Id.* at 206. But the Court has also recognized that there are limitations on

Congress's power to impose conditions. One limitation is that the condition must be "unambiguous[]," so that the States can "knowingly" decide whether to accept the money and any clear related conditions. *Id.* Importantly, Congress—not the Executive Branch—must impose the unambiguous condition. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]f *Congress* intends to impose a condition on the grant of federal moneys, *it* must do so unambiguously." (emphases added)).

With that background, turn to the provisions of federal law on which Plaintiffs rely. In § 2001(e)(2)(Q), Congress required local school districts receiving ARPA funds to use those funds to, among other things, "[d]evelop[] strategies and implement[] public health protocols including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff." ARPA, Pub. L. 117-2, § 2001(e)(2)(Q), 135 Stat. 4, 21 (Mar. 11, 2021); *see also* ECF No. 1, at 30. ARPA is no more specific than that.

Next, Plaintiffs point to the interim guidance from the U.S. Department of Education purporting to implement this provision of ARPA. In its interim final rule, the U.S. Department of Education mandated that local education agencies' plans "must describe" how the agencies "will maintain the health and safety of students, educators, and other staff and *the extent to which* it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC: . . . Universal and correct wearing of masks." ARPA Elementary & Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195, 21201 (Apr. 22, 2021) (emphasis added); *see also* ECF No. 1, at 30.

Plaintiffs also rely on an August 18, 2021 letter from Secretary of Education Miguel Cardona to Governor McMaster and Superintendent Spearman. *See* ECF No. 1, at 31; *see also* ECF No. 16-3, at 119–20. That letter implicitly admits the flaw in Plaintiffs' claim: The Secretary's letter either candidly or inadvertently acknowledges that the "Department's interim final requirements *clarify*" ARPA and require school districts to address CDC recommendations regarding masks. ECF No. 16-3, at 119 (emphasis added). Aside from the fact that the interim final rule is itself vague, if the Department of Education had to clarify ARPA, then Congress cannot possibly have imposed an unambiguous command.

The Fifth Circuit earlier this year addressed this very issue in a case involving the Department of Education, albeit in the context of a different regulation:

> [W]hen Congress places conditions on the States' receipt of federal funds, it must do so unambiguously. Regulations that interpret statutes are valid only if they either match Congress's unambiguous command or are clarifying a statutory ambiguity. Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of *Dole*.

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) (citations omitted); *see also id.* at 362 ("[T]he ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare. The Constitution carefully separates the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse.").

Even if Plaintiffs had not invoked the U.S. Department of Education's interim final rule or the Secretary's letter, they still lose on this claim. All Congress has provided is that, "to the greatest extent practicable," school districts must implement protocols "in line" with CDC guidance. For two reasons, this is not an unambiguous condition. *First*, § 2001(e)(2)(Q) requires action only "to

the greatest extent practicable." Whatever "the greatest extent practicable is," it is not an unambiguous requirement that States and their school districts must mandate the use of masks to comply with CDC guidance as a condition of receiving federal funds. *Second*, CDC guidelines are ever-evolving. *Compare* Mike Stobbe & Collin Binkley, *Vaccinated Teachers and Students Don't Need Masks, CDC Says*, Associated Press (July 9, 2021), https://tinyurl.com/hhdrfypk (summarizing updated guidance from the CDC that fully vaccinated people do not need to wear masks in schools), *with Guidance for COVID-19 Prevention in K-12 Schools*, Ctrs. for Disease Control & Prevention (Aug. 5, 2021), https://tinyurl.com/j8w6x88z (recommending that all students and teachers wear masks in light of the Delta variant, regardless of vaccination status). With these constant changes, Congress has not imposed an unambiguous condition that States may or must agree to or not. Instead, Congress has left States and school districts in a permanent flux as to what the condition might be on a given day, simply requiring school districts to develop strategies and implement policies "in line" with nonbinding CDC guidance and only "to the greatest extent practicable." *Cf. Pennhurst*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'"). Requiring a State's school districts to incorporate unspecified guidance when "practicable" is not preemption.

This is in stark contrast with *Dole*. There, the statute at issue was clear: Either a State must have a drinking age of 21, or else it will lose federal highway funds. *See* 483 U.S. at 205 (discussing 23 U.S.C. § 158). Under § 2001(e)(2)(Q), States have no such black-and-white choice. Rather, States are left to implementing, if and to the extent possible, the whims of the U.S. Department of Education's rules and the CDC's understandably evolving recommendations. Those nonstatutory

whims do not meet *Dole*'s requirement of an unambiguous *congressional* command, so Plaintiffs' claim fails.

## II.    Plaintiffs have not established that they are likely to suffer irreparable harm.

Another thing Plaintiffs must show to obtain a preliminary injunction is that they are "likely to suffer irreparable harm" without the injunction. *Winter*, 555 U.S. at 20. Plaintiffs insist they can meet this burden in three ways, but they are mistaken.

First, Plaintiffs say the Proviso violates federal law, so they are therefore being deprived of their civil rights. *See* ECF No. 16-1, at 20. That claim, of course, assumes they are clearly correct and likely to succeed on the merits. For the reasons just discussed, they are not. *See supra* Part I.

Unlike the decision related to masks, Plaintiffs present their second and third harms as an "either/or" choice that parents must make: Go to school and contract COVID-19, or stay home and miss in-person education. *See* ECF No. 16-1, at 20–22. In reality, although COVID-19 cannot and should not be taken lightly, the data indicates Plaintiffs do not necessarily face such a drastic conundrum. There are 74.1 million children in the United States. *See Child Population*, ChildStats.gov, https://tinyurl.com/f3cvtu3w (last accessed Sept. 9, 2021). There have been 5.05 million COVID-19 cases in children (or 6.8 percent of children). *See Children and COVID-19: State-Level Data Report*, American Academy of Pediatrics (Sept. 2, 2021), https://tinyurl.com/24wmuhfs. And as of September 8, 2021, 486 children have died of COVID-19 in the United States (or 0.00066 percent of children).[9] *See Provisional COVID-19 Deaths:*

---

[9] Any child's death is tragic, and statistics cannot possibly alleviate the heartache of the parents, siblings, and family of these children. Public policy, however, is must account for the big picture, and statistics are very relevant in that analysis. Likewise, the legal standard for granting extraordinary injunctive relief is inflexible. Here, Plaintiffs may disagree with the General Assembly's policy judgment, but Plaintiffs cannot make the showing required to overturn or enjoin state law and legislative policy.

*Focus on Ages 0-18 Years*, Ctrs. for Disease Control & Prevention (Sept. 8, 2021), https://tinyurl.com/rx69ffh8. Focusing on South Carolina specifically, six children between infancy and ten years old have died of COVID-19, and 12 children between ten and 20 years old have died of COVID-19, while there have been about 54,000 and 115,000 cases in those two age ranges. *See South Carolina County-Level Data for COVID-19: Deaths & Cases*, S.C. Dep't Health & Envtl. Control, https://tinyurl.com/ac62h5hw (last accessed Sept. 10, 2021). Children between infancy and age 20 account for only 2.1 percent (578 hospitalizations) of all COVID-19 hospitalizations in this State. *See South Carolina County-Level Data for COVID-19: Hospitalizations*, S.C. Dep't Health & Envtl. Control, https://tinyurl.com/ac62h5hw (last accessed Sept. 10, 2021).

Now, consider the stringent legal standard Plaintiffs must meet here: They must make a "clear showing" that they are "likely" to suffer an irreparable injury without an injunction. *Winter*, 555 U.S. at 22. Plaintiffs themselves even emphasize this standard, *see* ECF No. 16-1, at 22, but they never discuss what it actually requires. The "possibility" of future harm (even an irreparable one) is not enough. *Winter*, 555 U.S. at 22. "Likely" means "having a high probability of occurring or being true" or "very probable." *Likely*, Merriam-Webster (2021), https://tinyurl.com/3rxz7k38.

This data about COVID-19 and children makes clear that Plaintiffs do not have a "high probability" of contracting COVID-19 or having a severe outcome. Nothing their expert says changes this. He notes that people with intellectual disabilities have an "increased risk" of contracting and dying from COVID-19, but he never attempts to quantify that risk. *See* ECF No. 16-2, at 8. Even an "increased risk" may still, in absolute terms, be relatively small. Similarly, their expert comments that medical professionals "have raised concerns about the risks" to autistic

children. ECF No. 16-2, at 8. Again, it is not clear from his report that these "concerns" mean Plaintiffs' children are likely to contract COVID-19, whether or not they wear a mask or attend a school where masks are not mandated. Beyond this, he offers only anecdotes from his practice about parents being concerned about their children with disabilities. *See* ECF No. 16-2, at 8–9.

None of that meets the *Winter* standard. *See* 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (irreparable harm must be "actual and imminent"). In these uncertain times, it is understandable that parents may be concerned, but such concerns do not satisfy the requisite clear showing of irreparable harm. As another district court observed in a challenge to COVID-19 safety protocols, "the Court surely sees a possibility of irreparable harm from being exposed to COVID-19, particularly given [the plaintiffs'] respective health impairments. Nevertheless, the Court cannot say that it is likely on this record." *Chew*, 512 F. Supp. 3d at 1132. And so here. Plaintiffs have not offered anything to meet their burden that they are likely to contract COVID-19 or to have a severe outcome if they do. The Governor does not discount parents' perspectives or concerns, and neither does the Proviso passed by the General Assembly.

The cases Plaintiffs cite do not support a different result. Those cases do not sufficiently engage with *Winter* and the requirement that irreparable harm be "likely" to occur. *See* ECF No. 16-1, at 20–21. Instead, those cases—like Plaintiffs here—emphasize the irreparable harm part of this factor. No one disputes that any possibility of death (or even potentially hospitalization), however statistically remote or actuarily quantified, is an irreparable harm. But the Supreme Court did not say that a *possible* risk of irreparable harm was sufficient to obtain a preliminary injunction.

Instead, that harm must be *likely* to occur. To obtain the extraordinary relief they request from a federal court, Plaintiffs must demonstrate as much by a "clear showing." That is the bar Plaintiffs have not met.

### III.    The equities and public interest do not favor an injunction.

Taking the last two factors together because Governor McMaster is a government official, *see Nken v. Holder*, U.S. 418, 435 (2009), Plaintiffs treat it as almost a foregone conclusion that they will prevail on these factors. They are wrong. These factors cut against an injunction for at least three reasons.

*First*, the Proviso passed by the General Assembly is a valid exercise of legislative power on an issue of great public importance and ongoing debate. Courts have no authority to enjoin such legislative acts. As Chief Justice Roberts has explained, whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *cf. S. Bay United Pentecostal Church*, 140 S. Ct. at 1613–14 (noting the leeway elected officials have in responding to evolving public-health issues).

*Second*, granting an injunction here undermines the democratic process and threatens to erode public confidence in the judiciary. South Carolinians have been debating for months about the use of masks in schools and the role and rights of parents, as compared to the government, to make these decisions for their children. Plaintiffs and others have pushed for the General Assembly to repeal or change the Proviso (or called on the Governor to convene a "special session" of the General Assembly, which he cannot currently do). At least to date, their attempts have been unsuccessful. So, instead of redoubling their efforts, Plaintiffs ran to the courthouse, hoping to have a court do what their representatives did not or would not. That is not how our system of

government works. Concocting novel legal theories is not a proper backup plan to failed efforts to persuade those elected to represent their interest in the General Assembly. The courts are supposed to be the "least dangerous" branch. *The Federalist No. 78*, p. 464 (A. Hamilton) (C. Rossiter & C. Kelser eds. 2003). Sanctioning Plaintiffs' "legislating by litigating" strategy, particularly with their implausible claims, would make courts the most dangerous and least restrained branch.

*Third*, granting an injunction here discounts "the liberty of parents and guardians to direct the upbringing and education of children under their control." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("there is a constitutional dimension to the right of parents to direct the upbringing of their children"). While debate rages on about masks and experts present various and conflicting opinions, parents interact with their children every day, have a devoted interest in their children's wellbeing, and are best positioned to know what is best for their children. As contemplated by the Proviso, parents should be making decisions about their children's health and education, and courts should not interfere with parents' fundamental right and responsibility to do so.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Governor McMaster's Motion to Dismiss and deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov

*Counsel for Governor McMaster*

September 10, 2021
Columbia, South Carolina